## City of Covington et al. v. Reynolds et al.

(Decided June 5, 1931.)

ROBT. C. SIMMONS and CHESTER B. MASSLICH for appellants Covington-Cincinnati Cities Bridge Corporation and L. B. WILSON.

SAMUEL W. ADAMS for appellant City.

JOHN C. DOOLAN, CHARLTON B. THOMPSON, and A. E. STRICKLETT for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN.—Affirming.

About the year 1887, the Covington & Cincinnati Elevated Railroad & Transfer Bridge Company, hereinafter referred to as the bridge company, was formed by the consolidation of two companies, one of which had been incorporated in Kentucky and the other in Ohio. It constructed a bridge across the Ohio river between Covington and Cincinnati, and thereafter the bridge was used by the Louisville & Nashville Railroad Company and the Chesapeake & Ohio Railroad Company under contracts with the bridge company. The bridge company has also since the erection of the bridge maintained a vehicular highway and a sidewalk for foot passengers across it on which tolls have been charged. In 1927, the bridge company began the reconstruction of its bridge by extending one of the piers down stream, installing additional piers and by erecting upon the extended pier and additional piers a superstructure on the downstream side of the original structure. Since then the railroad tracks have been removed from the original structure and placed upon the new structure. A new and broad vehicular roadway or highway and an ample walkway for pedestrians have been constructed upon the original structure. In the reconstruction of the bridge, it became necessary to make a change of routing of the approaches to the bridge in the city of Covington, and to that end the railroad companies and the bridge company entered into negotiations with the city which culminated in an ordinance passed June 9, 1927, whereby the city of Covington granted certain rights to the three companies involving underpasses and overpasses and changes of routing in the streets and other public places of the city. The rights granted to these three companies were conditioned upon the bridge company giving to the city the right or option to purchase the highway and pedestrian portion of the bridge for the sum of $2,000,000. The companies accepted the ordinance with the condition

attached. However, the city was without funds to take advantage of the option it had thus obtained. A submission to the vote of the people of a bond issue to raise the necessary funds resulted adversely to the proposition. The matter being in this status, the city entered into a contract in the fall of 1929 with L. B. Wilson, a banker of Covington, looking to the purchase of the bridge. The details of this agreement are not of particular importance, but we may say that, in substance, it provided that the city should transfer to Wilson its option to buy the bridge, he should form a corporation to which he would transfer the option, the corporation should raise the necessary funds to buy the bridge, and, after reimbursing those to whom it had become indebted in the raising of the necessary funds for the purchase of the bridge and paying itself an agreed commission for its work out of tolls collected, the company should transfer the bridge to the city to be maintained thereafter as a free bridge. The Legislature of 1930 coming on, it passed chapter 95 of the acts of that year. So far as pertinent, that act provides:

"Be it enacted by the General Assembly of the Commonwealth of Kentucky:

"Sec. 1. That any city of the second class in this Commonwealth, for the purpose of ultimately acquiring and freeing from tolls any bridge or bridges wholly or partly within the city limits extending over any streams or other water course, including any river forming a state boundary line, on the highway and/or pedestrian portion of any such bridge or bridges, is hereby authorized to enter into a contract or contracts with any person, firm or corporation, domestic or foreign (hereinafter for convenience termed Corporation) qualified to enter into such contract which shall embrace the covenants provided for in Sections 2 and 3 of this act.

"Sec. 2. In such contract or contracts the Corporation shall agree: (a) to acquire the ownership of such bridge or portion thereof (unless it shall theretofore have acquired such ownership) and (b) to operate and maintain the same and (c) to charge and collect tolls for traffic over all such bridge or portion thereof, and (d) to apply the revenues therefrom, after deduction of the reasonable expense of operation, maintenance and repair and a reasonable

return to the Corporation not exceeding fifteen per cent (15%) of revenues after the deduction of such expense, to the amortization of the cost to the Corporation of such bridge or portion, with the proviso that if alterations or improvements shall be necessitated by law or by the order of any governmental or state department having jurisdiction so to order, or be necessitated by casualty or other necessity, such alterations or improvements not being in the nature of ordinary repairs or maintenance, all of the revenues, after deduction of the reasonable expense of operation, maintenance and repair, shall be applied to the amortization of the cost to the Corporation of such bridge or portion and to the cost of such alterations or improvements, all such costs to be deemed to include reasonable interest and financing costs, and (e) upon the completion of such amortization to surrender and turn over such bridge or portion to the City.

"Sec. 3. In such contract or contracts the City may agree to transfer and assign to the Corporation any interest or right the City may have in such bridge or portion, or any interest or right of the City to acquire the same, and shall agree to take over such bridge when turned over to it as hereinbefore provided, and thereafter to maintain and operate the same as a free bridge unless and until the same may be taken over and so maintained and operated by the Commonwealth or by the State Highway Commission, or by any other department of the Commonwealth. . . ."

"Sec. 5. Any such bridge or portion, so long as operated under any such contract, and thereafter so long as operated free of tolls as hereinabove provided, shall be deemed public property used for public purposes."

After the passage of this act, L. B. Wilson caused to be incorporated under the laws of Delaware the Covington-Cincinnati Cities Bridge Corporation, one of the appellants herein, and which will hereafter be referred to as the Cities Bridge Company. All of its capital stock is privately owned. He then assigned to this company any rights he had under his contract of 1929 with the city of Covington. On June 5, 1930, the city of Covington, also an appellant herein, passed an ordinance

recognizing the assignment and directing the execution by its officials of a contract between the city of Covington and the Cities Bridge Company. This ordinance was attacked in the courts. Its proponents being of the opinion that it should not have been passed until after the effective date of the act of 1930, which was some time in June after the passage of the ordinance of June 5th, the city of Covington passed, on August 7, 1930, another ordinance again recognizing the assignment and directing the execution by its officials of a contract between the city and the Cities Bridge Company set out in the ordinance. This is the contract which is attacked in this action. The appellees, who were the plaintiffs below, brought this suit as citizens and taxpayers to enjoin the execution of this contract on the grounds that its effect will be to create an indebtedness of the city in violation of the Constitution; that it is not in accordance with the act of 1930; that it is in effect a granting of a public franchise without advertisement and sale, as required in sections 163 and 164 of the Constitution; that the city has no right to cede to private interests its own corporate franchise to operate the bridge; that the city has no power to employ a private corporation as an agency or instrumentality of the city; that the exemption from taxation of the bridge and of the interest of the Delaware corporation in the bridge is unconstitutional; that section 5 of the Act of 1930 is unconstitutional; and that the ordinance of August 7th was not passed in accordance with the charter provisions of the city.

The contract, which is quite detailed, may, for the purpose of this opinion, be thus summarized: The city constitutes and appoints the Cities Bridge Company its agent and declares it to be an instrumentality of the city for the purposes of the contract. The city agrees to assign to the Cities Bridge Company the city's option to purchase for $2,000,000 the highway and pedestrian portion of the bridge heretofore mentioned. The Cities Bridge Company agrees to acquire ownership of the bridge as an agency of the city and to issue bridge revenue sinking fund gold bonds of the Cities Bridge Company bearing interest at not more than 6 per cent and not in excess of $2,500,000 in aggregate amount in order to secure the necessary funds wherewith to buy the bridge; the bonds to be sold at a price not lower than 90 cents on the dollar and accrued interest. Part of the moneys to be realized from the sale of the bonds is

to be spent for improving the approaches to the bridge, and part is to be put aside as an emergency fund to be used to pay interest in the event the tolls at any interest payment period are insufficient for that purpose. The bonds are to be issued under a trust indenture, copy of which is on file with the city. The Cities Bridge Company further agrees to operate and maintain the bridge as an agency of the city until it shall surrender the bridge to the city; to charge such tolls as may be necessary to operate and maintain the bridge and to amortize the cost of the bridge; to apply the tolls, first, to reasonable costs of operation, maintenance and repair; next to the payment of current interest; then to the payment to itself as compensation for its services a sum equal to 15 per cent of the tolls after deduction of the costs of operation, maintenance, and repair; then to pay the balance to a sinking fund to discharge the principal of the bonds. In the event alterations or improvements or extraordinary repairs on the bridge become necessary, the Cities Bridge Company may issue additional bonds to cover the costs of such charges. The compensation of the Cities Bridge Company is to cease ten years from the date it begins operation of the bridge. On completion of the amortization of the cost of the bridge and of any alterations or improvements, it is to be surrendered to the city to be thereafter operated as a free bridge. The city agrees to the issuance of the bonds and the execution of the trust indenture referred to. The Cities Bridge Company agrees that it will create no debt against the city in violation of the State Constitution, and that it will file semiannually with the city reports of its operations of the bridge, the city having the right to inspect the books of the Cities Bridge Company at all reasonable times. The city may on any default of the Cities Bridge Company take over the bridge and operate it, collect the tolls, and pay off the bonds. By the thirteenth clause of the contract, it is provided:

"It is of the essence of this agreement and one of the considerations thereof . . . and the parties hereby agree with each other accordingly, that the bridge, while operated under this agreement, shall be public property used for public purposes as contemplated by the Constitution of Kentucky, and as such, exempt from taxation in the Commonwealth."

The trust indenture to which reference has been made is conventional in its terms, and pledges the tolls of the bridge for the payment of the bonds and interest. As originally drafted, it gave to the trustee the right on any default by the Cities Bridge Company to take possession of the bridge and to operate it, collecting the tolls and paying off the bonds and interest, and also gave the trustee the right to have the bridge itself sold to satisfy the unpaid portion of the bonds and interest. By a supplemental resolution of its board of directors, the Cities Bridge Company has agreed to eliminate from the trust indenture this right on the part of the trustee to sell the bridge itself. We will assume solely for the purpose of this decision, that the Cities Bridge Company could adopt such a resolution that would be effective to accomplish the purpose intended.

The lower court enjoined the execution of this contract by the city officials mainly on the ground that it does not create the relationship of principal and agent between the city and the Cities Bridge Company, but is in fact a contract between the city and an independent entity, and therefore the provision for the exemption from taxation appearing in clause 13 is unconstitutional and hence void, which, being true, the contract is void because it expressly provides that this exemption from taxation is of the essence of the agreement. From the judgment so enjoining the execution of the contract, the city and the Cities Bridge Company, together with the officials of the city and L. B. Wilson, appeal.

The point upon which the lower court decided this case is indeed the pivotal point of the controversy. If the Cities Bridge Company is, by the terms of this contract, in truth but an agent of the city, then it is indeed the city which is the owner of the bridge and which is, through its agent, operating it. In such state of case, of course the exemption from taxation of the bridge is valid, and there would be no necessity for the sale of a franchise as provided in sections 163 and 164 of the Constitution. But if the Cities Bridge Company is not the agent of the city, but simply an independent entity which for a valuable consideration has agreed on its own responsibility to finance and operate the bridge, and if the bridge is ever paid for to transfer it ultimately to the city, then different considerations confront us. At the risk of being tedious, we repeat the salient features of the contract: The city transfers a concededly valuable option

to the Cities Bridge Company; this company then proceeds to acquire in its own name title to the bridge; it is to operate this bridge until its cost is amortized, which may never happen (the financial set-up of the bridge at Detroit was entirely upset by the completion of the Detroit and Canada Tunnel, the competition of which ate deeply into the receipts of the bridge); the Cities Bridge Company is to draw from the tolls it collects compensation for a period of ten years; it controls, manages, and operates the bridge during the time the cost is being amortized according to its notions, with no power on the part of the city to direct anything, although the city may perhaps require whatever action the Cities Bridge Company takes to be reasonable, a very flexible word indeed; the compensation which the bridge company gets goes to its own private stockholders; all the city can do during the time the Cities Bridge Company is the owner of the bridge and has control of it is to look at the books and see that the bridge company is not converting any of the tolls to purposes otherwise than expressed in the contract; it has no control over the internal affairs of the Cities Bridge Company. In short, the contract comes to this, the Cities Bridge Company agrees that if it can pay itself the compensation it is to get and the bondholders, it will for such consideration transfer the ownership of the bridge which it has taken over from the bridge company to the city. Perhaps the act of 1930 authorizes such a contract upon the part of the city. We will assume for the purpose of this decision that it does. But that act does not say that the company which thus owns, operates and finances the bridge shall be deemed to be the agent of the city. The act leaves the transaction it authorizes as in fact and law it is. Hence we do not have to determine whether the Legislature has the power to denominate a transaction something other than in law and fact it is. The contracts which the Cities Bridge Company make in the operation, maintenance, and repair of the bridge are its contracts. The city is under no liability whatever for them. The same is true with reference to the alterations or improvements which may be made in the bridge. The city has no control over who is to be employed in the operation of the bridge; it has no control over who is to run the Cities Bridge Company itself; it may not dispense with the Cities Bridge Company so long as the Cities Bridge Company makes no default in its covenants under the contract.

In short, it simply waits with its hands folded until the bonds are paid off and the Cities Bridge Company gets its compensation.

In Mechem on Agency (2d Ed.) vol. 1, p. 13, it is written:

"The relation of principal and agent, or the relation of agency in the narrower sense in which it is chiefly employed in this work, is the legal relation which exists where one person, called the agent, is authorized—usually by the act of the parties, but occasionally perhaps by operation of law to represent and act for another, called the principal, in the contractual dealings of the latter with third persons. The distinguishing features of the agent may briefly be said to be his representative character and his derivative authority."

In 21 R. C. L. p. 817, we find:

"An agency has been defined as a contract, either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name, or on his account, by which that other assumes to do the business, and to render an account of it. The employer—for between the parties themselves the relation of master and servant exists—is termed the principal and the employee is denominated his agent. The agent is the substitute or representative of his principal, and derives his authority from him. The relationship contemplates dealings by the agent with third persons; without this element there can be no agency, properly speaking."

In the case of Palmer & Hardin v. Grand Lodge K. of P. of Kentucky, 121 S. W. 678, 679, we said:

"The relation of principal and agent cannot exist, where the person acting acts for himself, not for another, and is without authority to act for him."

In Simons v. Vaughn & Blackwell, 165 Ky. 167, 176 S. W. 995, 999, we wrote:

"By the common law an agent was one who, by the authority and on account of another, undertook to do something for another, and to render an account of it."

To the same effect is Jeffrey Co. v. Lockridge, 173 Ky. 282, 190 S. W. 1103, and Hatcher-Powers Shoe Co. v. Kirk, 233 Ky. 19, 24 S. W. (2d) 903.

The contract here in question fails to bring the transaction it provides for under any definition of agency that we have had cited to us or that we have been able to find. The city here does nothing after transferring its option until the title is conveyed back to it by the Cities Bridge Company—something that it is possible will never be done. It has no control over the management of the bridge or the Cities Bridge Company in the interim. None of the contracts which the Cities Bridge Company may make in the management or operation of the bridge are to be obligations of the city. This is highly indicative of the independent character of the Cities Bridge Company. The city may only move in the event the Cities Bridge Company commits a default in its obligations under the contract. This is a very different state of case from that appearing in the cases of U. S. Shipping Board Merchant Fleet Corp. v. Harwood, 281 U. S. 519, 50 S. Ct. 372, 74 L. Ed. 1011; Skinner & Eddy Corp. v. McCarl, 275 U. S. 1, 48 S. Ct. 12, 72 L. Ed. 131, and Klein v. City of Louisville, 224 Ky. 624, 6 S. W. (2d) 1104. There the entities through which the governments proposed to act were the creatures of those governments, wholly owned and wholly controlled by them. The Cities Bridge Company in the instant case is owned neither in whole nor in part by the city, and the latter has no control whatever over its internal management and affairs nor over its external affairs except to require it to live up to its contract. Nor are the cases illustrative of which is Hager, Auditor, v. Kentucky Children's Home Society, 119 Ky. 235, 83 S. W. 605, 608, 26 Ky. Law Rep. 1133, 67 L. R. A. 815, in point. Those cases simply uphold the right of the state or county to work out a public function through an instrumentality independent of the state or county because, as said in the cited case:

"The appropriation is not made for the agency, but for the object which it serves."

But the question whether the property of the instrumentality should, because of the delegation to it by the state or county of the discharge of a public function, be exempt from taxation, was neither presented nor decided.

There being no relationship of principal and agent then between the city and the Cities Bridge Company, it necessarily follows that the city is without power to exempt from taxation the bridge as long as it is thus owned by the Cities Bridge Company. Both the legal and beneficial interest in the bridge during the amortization of the bonds is to be in the Cities Bridge Company; the legal title by the conveyance, and the beneficial interest because the use and income and benefit of the bridge are to be devoted to the payment of the compensation of the Cities Bridge Company and to the paying off of the bonds which it is agreed by the contract is no debt of the city, and hence can only be that of the Cities Bridge Company. During this period then the bridge and its use are undoubtedly private property. This period may be but temporary, or it may extend out indefinitely, depending on the success of the venture. But, temporary or otherwise, it represents a time when private interests are the owners of the legal title and beneficial use of the bridge. If section 5 of the Act of 1930 meant to authorize an exemption under such circumstances, it is clearly unconstitutional under section 170 of the State Constitution. South Covington & C. St. Ry. Co. v. Henkel & Sullivan, 228 Ky. 271, 14 S. W. (2d) 1069. By clause 13 of the contract, the provision for exemption from taxation is made the essence of the agreement and one of the considerations therefor. Hence, as long as this clause is present in the contract, unless the exemption from taxation be effective, the contract will have to fall. We have seen that this provision for exemption from taxation is invalid. Therefore, by its own terms, the contract is not to be binding on the parties. Whether the contract here involved would be valid with the tax exemption feature eliminated or not is not presented for decision in this record, and we express no opinion upon that question. The city officials under the ordinance have no authority to execute any contract other than the one set out in the ordinance, and, as that contract carries the invalid exemption from taxation in it, which by the contract itself is declared to be the essence of the contract, the lower court properly enjoined its execution by the city officials.

Judgment affirmed.

Whole court sitting.