GGNSC STANFORD, LLC, d/b/a Golden LivingCenter—Stanford; GGNSC Administrative Services, LLC, d/b/a Golden Ventures; GGNSC Holdings, LLC, d/b/a/ Golden Hoizons; GGNSC Equity Holdings, LLC; Golden Gate National Senior Care, LLC d/b/a Golden Living; Golden Gate Ancillary, LLC, d/b/a Golden Innovations; GPH Stanford, LLC and Kyle Privett, Appellants

v.

Robert ROWE and Richard Rowe, as Co–Administrators of the Estate of Deborah Rowe, deceased, and on behalf of the Wrongful Death Beneficiaries of Deborah Rowe, Appellees.

No. 2010–CA–002330–MR.

Court of Appeals of Kentucky.

Sept. 21, 2012.

Marcia L. Pearson (argued), Louisville, KY, for appellants.

Lisa E. Circeo and Robert E. Salyer (argued), Lexington, KY, for appellees.

Before ACREE, Chief Judge; CAPERTON and VANMETER, Judges.

## OPINION

ACREE, Chief Judge:

The primary question on appeal is whether the purported attorney-in-fact of an incompetent adult, ostensibly appointed by the incompetent person's parents, had actual or apparent authority to enter into an arbitration agreement on her behalf. If not, the question becomes whether the incompetent adult's estate can be estopped from arguing the arbitration agreement was invalid. Because we conclude that no person possessed actual or apparent authority to contractually bind the incompetent adult and that her estate cannot be estopped from arguing the actions of the purported attorney-in-fact were ineffectual, we affirm the order of the circuit court denying the appellants' motion to dismiss.[1]

### I. Facts and procedure

Deborah Rowe was born to Clara LaVon Rowe and William Henry Rowe in the mid–1950s.[2] She was mentally incompetent from birth, and her parents dutifully cared and provided for Deborah well into her adulthood. They never obtained an order of guardianship.

On October 24, 2001, Clara and William executed a document entitled "Power of Attorney," by which they purported to appoint Nancy Meadows Deborah's attorney-in-fact. The document provided as follows:

We, CLARA LAVON and WILLIAM HENRY ROWE, parents and guardians of, DEBORAH SUE ROWE, appoint NANCY MEADOWS as the attorney-in-fact in her name and stead to transact any and all business on behalf of our mentally handicapped daughter including, but not limited to, deposit and withdrawal of any funds from her bank account or other depository, endorsement of any commercial papers, voting of any proxy or proxies, execution of any legal

---

1. Although the motion was styled as a motion to dismiss, for purposes of this appeal we must treat it like a motion to compel arbitration. *See Kindred Nursing Centers Limited Partnership v. Brown*, —— S.W.3d —— (Ky. App.2011). Pursuant to KRS 417.220(1)(a), then, we have jurisdiction to entertain an appeal from denial of such a motion.

2. Her exact birth date is not apparent from the record.

documents necessary to encumber, sell, transfer or pass title to any real or personal property in which she owns an interest, and to transact any and all business from her and on her behalf. We give to each and every such act done by her attorney the same force and effect as if done in her person and absolve all persons dealing with the attorney-in-fact from any liability for her acts as such. This power is not revoked or affected by her subsequent incapacity or disability. We request our attorney-in-fact be appointed her fiduciary if we are determined to be incompetent or disabled.

Nancy began overseeing Deborah's affairs and decided in 2007 that the best place for Deborah to live would be a nursing home. Nancy chose Golden LivingCenter in Stanford, Kentucky, where Deborah was admitted. Nancy signed Deborah's admission papers, including an arbitration agreement, as "PoA." She presented a copy of the power of attorney document to Golden LivingCenter's director of admissions.

After nearly two years at Golden LivingCenter, Deborah died on February 17, 2009. Her brothers, Robert Rowe and Richard Rowe, as co-administrators of her estate, brought a wrongful death action in the Lincoln Circuit Court against the nursing home, the nursing home administrator, various corporate entities, and five "John Does," alleging the defendants had been negligent in causing Deborah's death and demanding compensatory and punitive damages.[3]

The defendants filed simultaneously an answer and a motion to dismiss asserting the arbitration agreement precluded the circuit court's adjudication of the dispute. In a forty-two page response, the Rowes insisted no valid, enforceable arbitration agreement existed and raised a number of legal arguments in support of that position; among those arguments was the contention that Nancy lacked authority to enter into the arbitration agreement on Deborah's behalf. The circuit court agreed and ruled in favor of Deborah's estate. The defendants filed a Kentucky Rule of Civil Procedure (CR) 59 motion in which they argued for the first time that the estate should be estopped from denying the validity of the arbitration agreement. That motion was likewise denied, and this appeal followed.

## II. *Arguments on appeal*

Golden LivingCenter presents three alternative bases for reversing the circuit court's determination that the arbitration agreement was invalid: (1) that Nancy had actual authority to sign the arbitration agreement on Deborah's behalf; (2) that Nancy had apparent authority to sign; and (3) that the estate should be estopped from denying the validity of the agreement. We will address each argument in turn.

## III. *Standard of review*

The party who raises an arbitration agreement as a bar to court proceedings bears the burden of showing a valid arbitration agreement exists. *Mt. Holly Nursing Center v. Crowdus*, 281 S.W.3d 809, 813 (Ky.App.2008). Ordinary contract principles govern the validity of an arbitration agreement. *Id.* (citing KRS 417.050).

The matters raised on appeal are entirely questions of law and equity, as Golden LivingCenter has raised no dispute with the circuit court's findings of fact. Consequently, our review is *de novo. Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky.App.1998) (citation omitted).

## IV. *Agency*

---

3. For the sake of convenience and ease of reading, we will hereinafter refer to all the defendant-appellants collectively as "Golden LivingCenter."

■ Because Golden LivingCenter contends Nancy possessed actual or apparent authority to act on Deborah's behalf, or perhaps on behalf of Deborah's parents, our analysis must begin with a discussion of how Nancy might have obtained such authority.

> [A]n agency is a contract either express or implied, by which one of the parties confides to the other the management of some business to be transacted in his name, or on his account, by which the other assumes to do the business, and to render an account of it. The agent is a substitute or representative of his principal and derives his authority from him.

*Stewart v. Kentucky Paving Co., Inc.,* 557 S.W.2d 435, 437 (Ky.App.1977) (citing *City of Covington v. Reynolds,* 240 Ky. 86, 41 S.W.2d 664 (1931)).

## A. *Actual authority*

■ Golden LivingCenter first contends Nancy had actual authority to form contractual relationships on behalf of Deborah, as impliedly granted by the "Power of Attorney" document. "Implied authority is actual authority circumstantially proven which the principal actually intended the agent to possess and includes such powers as are practically necessary to carry out the duties actually delegated." *Mill Street Church of Christ v. Hogan,* 785 S.W.2d

263, 267 (Ky.App.1990) (citing *Estell v. Barrickman,* 571 S.W.2d 650 (Ky.App. 1978), *overruled on other grounds* ).

The argument goes, more or less, like this: Deborah's parents had authority to act on her behalf, their authority was delegable, and Clara and William Rowe properly delegated that authority to Nancy.[4] For the grant of authority from Clara and William to Nancy to have been proper, then, Clara and William must first have possessed the authority to sign the arbitration agreement themselves.[5] Otherwise, the attempt to give Nancy Deborah's power of attorney would have no effect. Golden LivingCenter maintains that neither Deborah's parents nor Nancy needed to secure an order of guardianship pursuant to KRS Chapter 387 in order to obtain and exercise this authority.

The appellants have cited numerous legal sources which they believe authorized Deborah's parents to act on her behalf, despite the fact that neither parent was a court-appointed guardian. Those are: (1) Kentucky's statute governing the parent-child relationship, KRS 405.020; and (2) opinions in which Kentucky courts have interpreted and applied our healthcare surrogacy statutes.[6] After careful review of those laws, we cannot conclude any of

---

4. The nursing home has not argued that the principal-agent relationship was initially created by some grant of authority from Deborah to her parents. Indeed, because Deborah was mentally incompetent, she lacked the capacity to create such a relationship. 3 Am.Jur.2d Agency § 9 (2011) ("Any person who is *sui juris* and has capacity to affect his or her legal relationships by giving consent to a delegable act or transaction may authorize an agent to act for him or her[.]").

5. This is a necessary condition, but not a sufficient condition in itself, to give validity to a grant of power of attorney to Nancy.

6. Golden LivingCenter has also cited to Kentucky's statutes governing the appointment of personal representatives to oversee a decedent's estate, KRS 395.040 and KRS 395.005, in support of the argument that there is a legislative preference that "family members [be granted] authority to act on behalf of those who lack capacity to act for themselves." (Appellant's brief, 13). While death is certainly a type of incapacity which renders one incapable to act for him- or herself, those statutes have no bearing whatsoever on a parent's authority to contractually bind a living, incompetent adult daughter or son. We are not inclined, nor is it necessary, to discuss them further.

them created actual authority for Nancy or Deborah's parents to enter into the arbitration agreement.

### i. KRS 405.020(2)

■ This statute provides in pertinent part that, "The father and mother shall have the joint custody, care, and support of their children who have reached the age of eighteen (18) and who are wholly dependent because of permanent physical or mental disability." KRS 405.020(2). The right to custody of a disabled child who has reached the age of majority includes the ability to collect sums under $10,000 on behalf of that child.[7] KRS 387.280.

■ Having custody of one's offspring, however, is not synonymous with authority to enter contracts on his or her behalf. In fact, Kentucky courts have held that parents have no such authority unless they have obtained appointment as the child's guardian by a district court. *Scott v. Montgomery Traders Bank and Trust Company*, 956 S.W.2d 902, 904 (Ky.1997) (holding the mother of a child injured due to complications at his birth "was without legal authority ... to fund the trust from the settlement sums received as a result of [the child]'s injuries" because she had not been appointed the child's guardian by a district court.[8]); *see also Jones v. Cowan*, 729 S.W.2d 188 (Ky.App.1987) (holding a parent, acting merely as a minor child's next friend, could not enter a settlement agreement on the child's behalf, but that a child's statutory guardian could do so.).

■ Although those cases deal with minors, we find the rules stated therein are applicable to disabled adults, as well. There is no meaningful distinction, for purposes of an agency analysis, between mi-

nor children and incompetent adult offspring. When adults act on their behalf, both minors and incompetent adults are entitled to court oversight, via guardianship proceedings, to guarantee their interests are protected because they are not able to do so themselves. *See* KRS 387.500(2) ("guardianship and conservatorship for disabled persons shall be utilized ... to promote their well-being, including protection from neglect, exploitation, and abuse[.]"); *Branham v. Stewart*, 307 S.W.3d 94, 99 (Ky.2010) ("the role of ... the guardian is to protect and further the minor's or ward's interests.") (citation and footnote omitted).

■ Furthermore, implicit in KRS 387.280's grant of authority to receive amounts under $10,000 on behalf of a child in one's custody is the rule that custodians may not collect amounts over $10,000 without the oversight of a district court. *See Fox v. Grayson*, 317 S.W.3d 1, 8 (Ky.2010) ("It is a familiar and general rule of statutory construction that the mention of one thing implies the exclusion of another[.]") (citation, quotation marks, and footnote omitted). In light of the limited authority granted to custodians by KRS 405.020 and KRS 387.280, we cannot conclude they are permitted to contractually bind their wards without formal appointment as guardians. Golden LivingCenter has identified no law which permits parents, on the basis of custody alone, to enter into contracts on behalf of a child, particularly one who is an incompetent adult.

### ii. Healthcare surrogacy laws

■ Golden LivingCenter next contends the parents' authority to enter into the arbitration agreement derives from their

---

7. This rule applies, of course, only when no guardian or conservator has been appointed to oversee the child's affairs.

8. Although not explicitly stated in the opinion, it appears the settlement in *Scott* was for an amount greater than $10,000.

statutory authority to make healthcare decisions on Deborah's behalf. Specifically, Golden LivingCenter cites *DeGrella, v. Elston,* 858 S.W.2d 698 (Ky.1993), and argues that "Kentucky case law supports the premise that parents of an incompetent adult have inherent authority to act on their child's behalf." (Appellants' brief, p. 9).

Although Golden LivingCenter does not specify in what way any such right is inherent, we agree that, absent some overriding grant of authority,[9] Deborah's parents had the statutory authority to make healthcare decisions for her. KRS 311.631(1) explicitly provides as much.

> If an adult patient whose physician has determined that he or she does not have decisional capacity has not executed an advance directive, or to the extent the advance directive does not address a decision that must be made, any one (1) of the following responsible parties, in the following order of priority if no individual in a prior class is reasonably available, willing, and competent to act, shall be authorized to make health care decisions on behalf of the patient:
>
> (a) The judicially-appointed guardian of the patient, if the guardian has been appointed and if medical decisions are within the scope of the guardianship;
>
> (b) The attorney-in-fact named in a durable power of attorney, if the durable power of attorney specifically includes authority for health care decisions;
>
> (c) The spouse of the patient;
>
> (d) An adult child of the patient, or if the patient has more than one (1) child, the majority of the adult children who are reasonably available for consultation;
>
> (e) The parents of the patient;
>
> (f) The nearest living relative of the patient, or if more than one (1) relative of the same relation is reasonably available for consultation, a majority of the nearest living relatives.

KRS 311.631. Clearly, parents of an incompetent person are authorized to make healthcare decisions on behalf of that person given the right circumstances.

Whether to enter into an arbitration agreement, however, is not a healthcare decision. Rather, healthcare decisions are defined in Kentucky's Living Will Directive Act as follows: " 'Health care decision' means consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." KRS 311.621(8). The arbitration agreement at issue here, on the other hand, does not concern any type of medical treatment, procedure, or intervention; rather, it addresses only means of dispute resolution:

> It is understood and agreed by Facility and Resident that any and all claims, disputes, or controversies ... arising out of, or in connection with, or relating in any way to the Admission Agreement or any service or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration[.]

Furthermore, execution of the arbitration agreement was not a necessary part of the agreement to admit Deborah to the nursing home; it was separate and ancillary. Neither Kentucky's advance directive statutes nor the accompanying case law created authority in Clara and William to enter into an arbitration agreement on Deborah's behalf.

### iii. Power of attorney

▮▮▮▮ Even if Deborah's parents somehow did have the authority to enter

---

**9.** Examples would be an order of guardianship or, presuming Deborah's competence, her direct and valid grant of authority to Nancy pursuant to a power of attorney.

into the arbitration agreement, Nancy most certainly did not because the "Power of Attorney" executed by Clara and William did not make her attorney-in-fact for Deborah. It is elementary that the person naming an attorney-in-fact must be the person for whom the attorney-in-fact is appointed. *See Moore v. Scott*, 759 S.W.2d 827, 829 (Ky.App.1988). Deborah's parents could no more name Nancy attorney-in-fact for Deborah than they could name Nancy attorney-in-fact for each other.

### iv. Guardianship

The only law cited by either party which grants the authority to enter into contracts on behalf of a disabled adult is found in Kentucky's guardianship statutes. KRS 387.660; *see also Scott*, 956 S.W.2d at 904; *Jones v. Cowan*, 729 S.W.2d 188. However, because Nancy failed to take the procedural steps necessary to become a guardian, she was incapable of contracting on Deborah's behalf. Her attempt to enter into an arbitration agreement was therefore unsuccessful.

### B. Apparent authority

 Golden LivingCenter next argues that Nancy had apparent authority to enter into the arbitration agreement for Deborah, and therefore the estate should be bound to it. That argument goes as follows: Deborah's parents, utilizing their inherent authority to act on her behalf, held Nancy out as Deborah's agent, and the nursing home was justified in believing Nancy was Deborah's agent. That the power of attorney document was ineffective, Golden LivingCenter asserts, is inconsequential because Clara and William Rowe held Nancy out as Deborah's agent.

First, we must repeat that Deborah's parents had no authority, inherent or otherwise, to act on her behalf in this manner. This impressively convoluted argument fails for that reason alone.

 But Golden LivingCenter is right that apparent authority exists when the principal creates the appearance of authority in a purported agent. "Apparent authority … is not actual authority but is the authority the agent is held out by the principal as possessing. It is a matter of appearances on which third parties come to rely." *Mill Street Church of Christ v. Hogan*, 785 S.W.2d at 267 (citation omitted). More specifically, apparent authority "is that which, by reason of prevailing usage or other circumstance, the agent is in effect held out by the principal as possessing." *Estell v. Barrickman*, 571 S.W.2d 650, 652 (Ky.App.1978) (overruled on other grounds)(citing Annot., 2 A.L.R.2d 406, 407 (1948)).

The principal problem with the nursing home's argument, however, is that it is based upon a faulty premise: Deborah's parents were not and could not be the principals in this set of facts. Nancy was purporting to act on Deborah's behalf, and not on behalf of Clara and William. Attempts to trace Nancy's so-called apparent authority to Deborah's parents, then, must be unsuccessful because their actions could not create a reasonable belief in Golden LivingCenter that Nancy had authority to act on Deborah's behalf. *See Mt. Holly Nursing Center v. Crowdus*, 281 S.W.3d 809, 814 (Ky.App.2008) (finding no apparent authority because there was no a evidence nursing home patient did anything to hold out her friend, who signed admission papers on behalf of the patient, as her agent).

Furthermore, if Clara and William were somehow agents of Deborah, *they* would be the persons bound by Nancy's actions because Nancy was, at best, a sub-agent. A sub-agent appointed without authorization by the principal is the agent of the agent, not the agent of the principal. 3 Am.Jur.2d Agency § 7(2011). The person

who can be held to account for the sub-agent's actions is the agent. *See id.* There is no evidence here that Deborah authorized the appointment of Nancy or even that she had the capacity to do so; therefore if anyone created the appearance that Nancy was authorized to take any action, it was Clara and William, and Deborah's estate cannot be bound to the arbitration agreement.

■ Once again, we affirm that no one, not even parents of an incompetent adult, can name an attorney-in-fact on behalf of another. Nursing home personnel should have been alerted to the problem with the attempted delegation of power of attorney simply by reading the document. The person admitted to the nursing home, and for whom Nancy purported to sign, was not the person who executed the power of attorney document. It was therefore incapable of transmitting even the appearance that Nancy was authorized to sign it for Deborah.

## V. *Estoppel*

■ Finally, Golden LivingCenter argues Clara and William, as beneficiaries of Deborah's estate, should be estopped from denying the validity of the arbitration agreement. We are not persuaded that reversal is warranted on this basis, either.

We must first address the issue of preservation raised by Deborah's estate, which maintains the argument was not properly preserved. We agree. The nursing home failed to raise the argument until the filing of its Rule 59 motion. The grounds for such a motion are: irregularity of the proceedings which rendered trial unfair; misconduct of the jury, an attorney, or a party; accident or surprise; improper award of damages; a verdict which runs afoul of the evidence or the law; or newly discovered evidence which could not reasonably have been discovered prior to en-try of the order subject to the motion to reconsider. CR 59.01. The estoppel argument falls into none of these categories; rather, it was a new argument which Golden LivingCenter could have raised in its motion to dismiss. The appellees are correct that the argument was not properly preserved, and the correct standard of review is for palpable error only. CR 61.02.

We find no palpable error here. As a very general matter, estoppel is "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before or what has been legally established as true." Estoppel, *Black's Law Dictionary* (9th ed.2009). Once again, Golden LivingCenter is confusing the responsible parties. The nursing home desires to estop Deborah's estate from denying the enforceability of the arbitration agreement because William and Clara—not Deborah or an authorized representative of Deborah's estate—led nursing home personnel to believe Nancy was authorized to enter into the arbitration agreement. They supposedly did so by executing the ineffectual power of attorney document. If anyone can be estopped, it must be Nancy, the only competent person who made any representations whatsoever to Golden LivingCenter. Nancy is not a party to the instant action, and the estate cannot be estopped in her stead.

Even if Golden LivingCenter could estop the estate from denying the actions of the decedent's parents, estoppel would not be appropriate here. There is no evidence that by executing the power of attorney instrument Clara and William intended to mislead the nursing home or any other party. *Frank v. Estate of Enderle,* 253 S.W.3d 570, 576 (Ky.App.2008). Rather, it appears the two merely mistakenly believed they could transfer care and control of Deborah to Nancy, and attempted to do so.

## VI. *Conclusions*

Golden LivingCenter has advanced no theory by which the arbitration agreement at issue may be deemed valid. The circuit court correctly denied the motion to dismiss on the basis of the arbitration agreement, and we are compelled to affirm.

ALL CONCUR.