RENDERED: MAY 19, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0993-MR

PADUCAH CENTER FOR HEALTH
AND REHABILITATION, LLC D/B/A
STONECREEK HEALTH AND
REHABILITATION; CLEARVIEW
HEALTHCARE MANAGEMENT KY,
LLC D/B/A CLEARVIEW
HEALTHCARE MANAGEMENT;
PADUCAH CONSULTING, LLC;
PADUCAH PROPCO; AND SARAH
STEWART, IN HER CAPACITY AS
ADMINISTRATOR OF
STONECREEK HEALTH AND
REHABILITATION                                                                        APPELLANTS


|   | APPEAL FROM MCCRACKEN CIRCUIT COURT |
|---|---|
| v. | HONORABLE TIMOTHY KALTENBACH, JUDGE |
|   | ACTION NO. 22-CI-00042 |


TERRY LANCE PENIX, AS
EXECUTOR OF THE ESTATE OF
TERRY LYNN PENIX, DECEASED
AND TERESA PENIX,
INDIVIDUALLY                                                                              APPELLEES

## OPINION
## AFFIRMING

\*\* \*\* \*\* \*\* \*\*

BEFORE:  CETRULO, JONES, AND TAYLOR, JUDGES.

CETRULO, JUDGE:  This is an appeal from a ruling of the McCracken Circuit Court, which denied a motion to compel arbitration filed by the Paducah Center for Health and Rehabilitation, LLC d/b/a Stonecreek Health and Rehabilitation ("Stonecreek"); Paducah Consulting, LLC; Clearview Healthcare Management KY, LLC d/b/a Clearview Healthcare Management; Paducah Propco; and Sarah Stewart, in her capacity as Administrator of Stonecreek Health and Rehabilitation. The underlying action was one for wrongful death, negligence, loss of consortium, and punitive damages filed against Stonecreek, a nursing home, and its corporate entities and administrator.  Terry Lynn Penix ("Terry") had been a resident of Stonecreek for approximately one year prior to his death in March 2021.  The suit was filed through his executor, Terry Lance Penix, and his wife, Teresa Penix ("Teresa").  Stonecreek filed a motion to dismiss.  The trial court did not dismiss the complaint nor compel arbitration, finding that Stonecreek did not meet its burden of establishing a valid agreement to arbitrate.  For the reasons set forth below, we affirm.

## FACTS

In 2014, Terry executed a Living Will Directive and Advance Directive ("POA") naming Teresa as his health care power of attorney. In 2020, Terry was admitted as a resident to Stonecreek. The record does not contain any information as to his physical or mental status at that point, but as part of the admission process, Teresa executed an Admissions Agreement ("the Agreement"). She did so by signing her name at the end of the document, above a line which read "Resident – Individual or by Legal Representative." This was in response to a provision acknowledging that the Agreement had been read and understood.

A second provision at the end of the Agreement required a "sponsor's" name and signature acknowledging that the person "agreed to the personal undertakings of the sponsor, as provided for in the Agreement[.]" Teresa wrote her name below that acknowledgement, not on a signature line, but next to a line that read "Sponsor." Below that, she entered the word "wife" next to a line that read "Relation." However, on the first page of the document, she had written "Terry L. Penix," as sponsor.[1] In another section of the Agreement, "sponsor" was defined as "a person legally responsible for the [r]esident or must be in the process

---

[1] It is not clear whether Teresa intended "Terry L. Penix" to refer to "Terry Lance Penix," the executor listed in the complaint filed a year later, or to her husband "Terry Lynn Penix."

of obtaining such status, including a guardian, a person holding a durable power of attorney and/or a conservator."

Elsewhere in the 12-page agreement, there was a section entitled "Disputes." That section read, in part, that:

> (i) To the fullest extent allowed by law, Resident and/or the Resident's legally authorized representative who signs this Agreement, on behalf of the Resident, the Resident's heirs, assigns, and all others acting or purporting to act for the Resident or the Resident's estate, and Facility agree that **all civil claims arising in any way out of this Agreement or the nursing care that Facility, its employees, or agents provide to Resident**, other than claims by the Facility to collect unpaid bills for services rendered, or to involuntarily discharge the Resident, **shall be resolved exclusively through mandatory mediation, and, if such mediation does not resolve the dispute, through binding arbitration using the commercial mediation and arbitration rules and procedures of JAMS/Endispute**. . . . (ii) Resident and Facility also agree that, **to the greatest extent allowed by law, both Resident and Facility shall seek only actual damages in any such mediation or arbitration, and that neither of them will pursue any claim for punitive damages, treble damages or any other type of damages the purpose of which are to punish one party in an amount greater than the actual damages allegedly caused by the other party**[.]

A little over a year later in March 2021, Terry left the nursing home. He died a few weeks later. On January 23, 2022, Terry's estate filed a complaint alleging negligence, wrongful death, and spousal consortium claims against

Stonecreek.[2]  Stonecreek answered and then filed the motion to dismiss and compel arbitration, based upon the "Disputes" provision, the signatures referenced above, and the power of attorney for health care.  In response, the estate argued that Teresa had signed the Agreement in her capacity as wife to Terry, that she lacked the authority to bind him or the estate to the arbitration provision of the Agreement, and that enforcement of the same would deprive the estate of its constitutionally protected right to a trial by jury.  The trial court denied the motion to compel arbitration, resulting in this appeal.

## LEGAL ANALYSIS

Arbitration agreements are contracts; therefore, to determine if an arbitration agreement is enforceable, a court must look to principles governing contract law.  *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 591 (Ky. 2012); *see also General Steel Corp. v. Collins*, 196 S.W.3d 18, 20 (Ky. App. 2006).  The enforcement and effect of an arbitration agreement is governed by the Kentucky Uniform Arbitration Act ("KUAA"), Kentucky Revised Statutes ("KRS")

---

[2] The parties agree that the wrongful death claim asserted in the complaint was not subject to arbitration, regardless, because it belongs to the beneficiaries under Kentucky's wrongful death statute, Kentucky Revised Statute 411.130.  An agreement to arbitrate claims against a skilled nursing facility operator did not bind wrongful death beneficiaries to arbitrate her wrongful death claim against operators.  *Diversicare of Nicholasville, LLC v. Lowry*, 213 F. Supp. 3d 859, 869-70 (E.D. Ky. 2016).  *See also Kindred Nursing Centers Ltd. Partnership v. Cox*, 486 S.W.3d 892, 893 (Ky. App. 2015) ("Under Kentucky precedent, wrongful death claims are not subject to arbitration.").

417.045-417.240, and the Federal Arbitration Act ("FAA"), 9 U.S.C.[3] §§ 1-402. "Both Acts evince a legislative policy favoring arbitration agreements, or at least shielding them from disfavor." *Ping*, 376 S.W.3d at 588.

Further, the Kentucky Supreme Court explained that under both Acts, the party "seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate." *Id.* at 590 (citations omitted). Then, "[u]nless the parties clearly and unmistakably manifest a contrary intent, that initial showing is addressed to the [trial] court . . . and the existence of the agreement depends on state law rules of contract formation." *Id.* (citations omitted). This Court reviews the trial court's application of those rules *de novo*. However, we review any factual findings for clear error. *Id.* (citation omitted).

Importantly, nothing in the FAA modifies the basic principles of state contract law regarding the scope of agreements and who is bound by them. *Golden Gate Nat'l Senior Care, LLC v. Rucker*, 588 S.W.3d 868, 870 (Ky. App. 2019). (citation omitted). Therefore, "[o]rdinary contract principles govern the validity of an arbitration agreement." *GGNSC Stanford, LLC v. Rowe*, 388 S.W.3d 117, 121 (Ky. App. 2012). Moreover, arbitration agreements "constitute a waiver of the right to a trial by jury, which is a fundamental right." *Jackson v. Legacy Health*

---

[3] United States Code.

*Servs., Inc.*, 640 S.W.3d 728, 735 (Ky. 2022) (citations omitted); *see also* KY. CONST. § 7.

As discussed, we must first determine whether the party seeking to compel arbitration – here, Stonecreek – met its burden of establishing the existence of a valid agreement to arbitrate. *Ping*, 376 S.W.3d at 590. In Kentucky, to form a valid and enforceable agreement, "there must be voluntary and complete assent by parties having the capacity to contract." *Cambridge Place Group, LLC v. Mundy*, 617 S.W.3d 838, 840 (Ky. App. 2021) (citation omitted). The trial court found that Stonecreek failed to meet its burden.

While the trial court noted that Terry had named Teresa as his health care surrogate in 2014, it framed the issue as determining whether she signed the Agreement *in that capacity*. The trial court found that she had not done so, relying in large part on an unpublished opinion of this Court, *Providence Healthcare of Pine Meadows, LLC v. Roark*, No. 2020-CA-0117-MR, 2020 WL 7086083 (Ky. App. Dec. 4, 2020). We agree that *Roark* is quite analogous and thus bears further discussion.

In *Roark*, a nursing home resident had executed a power of attorney naming his son as his health care attorney-in-fact. *Roark*, 2020 WL 7086083, at *1. During Roark's admission to the facility, his son had executed a document similar to the Agreement herein, which included an arbitration agreement. *Id.*

However, as here, the son had signed the documents with his name only and did not indicate his status as attorney-in-fact.  *Id.*  This Court upheld the trial court's ruling that the nursing facility had failed to meet its burden of establishing the existence of a valid arbitration agreement.  *Id.* at *3.

Here, Stonecreek initially asserts that this Court should not rely upon an unpublished opinion, and secondly, that the *Roark* decision is distinguishable from this case.  As Stonecreek points out, Teresa did fill in her name or initial this document in a few other places next to the line, "Sponsor Name."  Additionally, Stonecreek's contract did define the term "sponsor" earlier in the document as "a person legally responsible for the [r]esident or [sic] must be in the process of obtaining such status, including a guardian, a person holding a durable power of attorney and/or a conservator."

However, as the trial court noted, Teresa did not sign at any time as attorney-in-fact or power of attorney.  Moreover, on the first page of the document, she wrote "Terry L. Penix" as sponsor, rather than her own name.  Therefore, she argues she did not sign the Agreement in her capacity as a health care attorney-in-fact or as sponsor, but as his wife.  Like the trial court, we find the *Roark* opinion to be indistinguishable from this case.  Moreover, we also rely upon several published opinions that address such arbitration clauses in nursing home scenarios.

In *Ping*, our Supreme Court clarified that legal representatives may execute arbitration agreements on behalf of a facility's resident. *Ping*, 376 S.W.3d at 593. However, an attorney-in-fact does not have the authority to bind principals to pre-dispute arbitration agreements **unless such authority is clearly stated** in the durable power of attorney. *Genesis Healthcare, LLC v. Stevens*, 544 S.W.3d 645, 651 (Ky. App. 2017).

In *Genesis*, this Court followed our Supreme Court's directive in *Ping*, noting that:

> an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the utmost good faith. *Ping*, 376 S.W.3d at 592, citing *Wabner v. Black*, 7 S.W.3d 379, 381 (1999), and *Restatement (Second) of Agency*, § 37 (1958). Consequently, general expressions of authority must be construed in furtherance of the specific powers granted by the POA. *Id.* at 592-93.

*Id.*

Here, the POA designated Teresa as the Agent and provided the "powers conferred upon a health care Agent by KRS 311.629,"[4] which it explained applied "only as to those health care decisions for which [Terry is] unable to give informed consent." The POA went on to detail specific preferences concerning such "health care decisions," including mechanical ventilation, dialysis, antibiotics,

---

[4] KRS 311.629 details the powers of health care surrogates, which specifically notes powers including making health care, treatment, and nutrition decisions.

and artificial nutrition and hydration. Additionally, the POA provided the Agent – *i.e.*, Teresa – with authority to "[t]ake any lawful actions that may be necessary to carry out these decisions, including, but not limited to: (i) signing, executing, delivering, and acknowledging any agreement, release, authorization, or other document that may be necessary, desirable, convenient, or proper in order to exercise and carry out any of these powers . . . ." Thus, here, we must determine whether the POA provided authority for Teresa to enter an arbitration agreement, thereby waiving Terry's right to a jury trial.

In *Rowe*, we held that even though parents of an incompetent person had the right to make health care decisions under KRS 311.621 – Kentucky's Living Will Directive Act – entering into an arbitration agreement was not a health care decision as defined by the statute. *Rowe*, 388 S.W.3d at 124. Specifically, the statute provides that "'Health care decision' means consenting to, or withdrawing consent for, any medical procedure, treatment, or intervention." *Id.* (citing KRS 311.621(8)). There, we noted, the arbitration agreement did not concern "any type of medical treatment, procedure, or intervention[,]" and like here, addressed "only means of dispute resolution[.]" *Id.* Importantly, we explained that the arbitration agreement was not a necessary part of the agreement to admit the resident, but instead was "separate and ancillary." *Id.*

-10-

Here, we have found nothing within the body of the Agreement that states it was mandatory for admission. While that was briefly suggested by Stonecreek's counsel at the hearing on the motion, it was not addressed by the trial court in its opinion, nor did the parties discuss this in their briefs.

Similarly, in *Rucker*, this Court noted that a provision in the power of attorney enabling the agent to "institute, maintain, defend, settle and dismiss legal proceedings . . . did not expressly authorize [the agent] to enter into an arbitration agreement, which would have the effect of *waiving* [the resident-principal's] right to a jury trial." *Rucker*, 588 S.W.3d at 871 (emphasis added). Again, citing to *Ping*, we held that "[a]bsent authorization in the [power of attorney] to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly." *Id.* (quoting *Ping*, 376 S.W.3d at 593). There, the trial court had acknowledged, like here, the power of attorney did not suggest that the principal's intent was to authorize the agent to make such waivers on the principal's behalf; "therefore, no *actual* or *apparent* authority existed to sign the arbitration agreement." *Id.*

Furthermore, in *Mundy*, 617 S.W.3d at 841, this Court addressed a strikingly similar case involving a wife who signed an admissions agreement for her husband to enter a nursing home and listed her relation as "wife" rather than power of attorney. We held that the arbitration agreement signed by the resident's

-11-

spouse was invalid, in part, because she specifically wrote "wife" above a line entitled "Legal Representative Capacity (*i.e.*, guardian, spouse, child, Attorney-in Fact, etc.)" stating:

> While Cambridge is correct that Kentucky law does not require a party to explicitly state they are acting as an attorney-in-fact, the issue herein is not [the agent's] silence but rather her affirmative avowal that she was *acting in a separate capacity*. In her capacity as wife, [the agent] was authorized to make limited decisions on behalf of [the principal]; however, the pre-dispute arbitration agreement was outside that scope.

*Id.* (citing *Rowe*, 388 S.W.3d at 124) (emphasis added). Accordingly, we found the trial court had not erred when it found there was not a valid arbitration agreement. *Id.*

Similarly, here, Teresa not only failed to designate herself as the power of attorney, but she also specifically indicated that she was acting as Terry's wife. As in *Mundy*, the trial court here found such indication suggested Teresa was signing the agreement in her "wife" capacity, not as power of attorney. As in *Mundy*, the trial court did not err in finding there was not a valid arbitration agreement.

Indeed, our review of the plethora of cases arising out of nursing home arbitration agreements reveals that the vast majority have ruled that such agreements are not enforceable for a host of reasons. We are mindful of the recent decision in *LP Louisville East, LLC v. Patton*, 651 S.W.3d 759, 770 (Ky. 2020), *as*

-12-

*modified on denial of reh'g* (Apr. 29, 2021), which did enforce an arbitration agreement executed by a son admitting his father into a nursing facility. However, that agreement, entitled "Agreement to Informally Resolve and Arbitrate All Disputes," stated that it *required* "all new residents and/or their legal representatives to read, agree, and sign" the agreement as a condition of admission to the facility. *Id.* at 762. We find no such requirement here.

Further, there, the power of attorney that the son provided to the facility specifically authorized him to "submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation[.]" *Id.* at 763. Again, here, there is no such authorization in the POA.

Finally, subsequent to *Patton*, our Supreme Court held that a nursing home resident's fundamental right to trial by jury was denied by her son's signature as guardian on a voluntary arbitration agreement. In *Jackson*, our Supreme Court reversed a panel of this Court in a matter of first impression, specifically stating that the fundamental right to a jury trial was limited beyond the extent necessary to provide needed care and services, because the arbitration agreement in that case was not a condition of the patient receiving care or being admitted to the facility. *Jackson*, 640 S.W.3d at 735. The Supreme Court found that because release of that right was not necessary for services, the guardian

-13-

lacked the authority to enter into the arbitration agreement, so it was not binding, and void. *Id.*

Here, similarly, the Agreement does not state that the arbitration agreement was required as a condition for admission to Stonecreek. The POA did not specifically authorize Teresa to agree to arbitration. Teresa had only signed the Agreement in her capacity as wife, under KRS 311.621, not as power of attorney. Finally, the Agreement, while signed or initialed by Teresa in a few locations next to the line "Sponsor," also specifically listed "Terry L. Penix" as sponsor on the first page. Based upon general contract principles and upon ample authorities upholding a resident's fundamental right to a jury trial, unless clearly released by a power of attorney granting full authority to do so, the trial court properly applied the law in finding that Stonecreek did not meet its burden of establishing a valid, enforceable agreement. Accordingly, we affirm the denial of the motion to compel arbitration.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

A. Pete Pullen
Leah T. Scharff
Louisville, Kentucky

BRIEF FOR APPELLEES:

Brian M. Jasper
Louisville, Kentucky