IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 22, 2023 Session

## JAMES WILLIAMS v. SMYRNA RESIDENTIAL, LLC ET AL.

**Appeal by Permission from the Court of Appeals
Circuit Court for Rutherford County
No. 78245     Bonita Jo Atwood, Judge**

_____

### No. M2021-00927-SC-R11-CV

_____

Granville Williams, Jr., died while residing at an assisted-living facility. The central question in this appeal is whether his son's ensuing wrongful-death action against the facility must be arbitrated. To answer that question, we must resolve two subsidiary issues—first, whether the attorney-in-fact who signed the arbitration agreement as Williams's representative had authority to do so and, second, whether Williams's son and other wrongful-death beneficiaries who were not parties to the arbitration agreement nevertheless are bound by it. We hold that signing an optional arbitration agreement—that is, one that is not a condition of admission to a health care facility—is not a "health care decision" within the meaning of the Durable Power of Attorney for Health Care Act. The durable power of attorney that gave Williams's attorney-in-fact authority to act for him in "all claims and litigation matters" thus provided authority to enter the optional arbitration agreement even though it did not specifically grant authority to make health care decisions. We further hold that Williams's son is bound by the arbitration agreement because his wrongful-death claims are derivative of his father's claims. Because we conclude that the claims in this action are subject to arbitration, we reverse the Court of Appeals' contrary decision and remand to the trial court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed; Remanded to the Circuit Court**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined. HOLLY KIRBY, C.J., and SHARON G. LEE, J., filed dissenting opinions.

Christy T. Crider and Caldwell G. Collins, Nashville, Tennessee, for the appellants, Americare Systems, Inc., and Smyrna Residential, LLC.

Richard D. Piliponis, Benjamin J. Miller, and Sarah L. Martin, Nashville, Tennessee, for the appellee, James Earl Williams.

**OPINION**

I.

A.

In 2007, Granville Williams, Jr., executed a durable power of attorney naming his daughter, Karen Sams, as his attorney-in-fact. The power of attorney was executed in Tennessee and provides that Tennessee law will govern the use of the document. Under the heading, "Attorney-in-fact Powers," the document includes the sentence, "Select the powers you want to give your attorney." Appearing below that sentence is a list of the following ten powers:

[1] To sell, mortgage, exchange, lease or otherwise deal with real estate, land and business.
[2] To buy, sell[, and] deal with chattels and goods[](tangible personal property).
[3] To control bank and financial interest.
[4] To control or direct personal business or business interest.
[5] To control any insurance or annuity policy.
[6] To act for me in estate, trust and other beneficiary transaction.
[7] To act for me by managing assets transferred to any living trust that I may have.
[8] To act for me in all claims and litigation matters.
[9] To act for me in securing all governmental benefits owed to me.
[10] To take any action required to fulfill tax obligations.

Williams selected all ten powers. And when asked whether he "wish[ed] to put restrictions on [his] attorney-in-fact," Williams answered "no." The power of attorney did not include an end date, and the parties agree that it remained in effect at all times relevant to this action.

In early 2020, Williams was admitted to an assisted-care living facility called Azalea Court. Relying on the power of attorney, Sams signed the admission agreement as Williams's representative.

- 2 -

The admission agreement contains an alternative dispute resolution clause that subjects all disputes under the agreement to arbitration. The clause incorporates the terms and conditions of a separate arbitration agreement, which Sams also signed as Williams's representative. That agreement, in turn, provides that "any dispute" under the admission agreement will be submitted to arbitration as provided by Tennessee law "except to the extent preempted by the Federal Arbitration Act." The arbitration agreement applies broadly to "any legal claim or civil action of either party in connection with or related to [a] [r]esident's stay at the [f]acility." And it provides that the arbitration agreement is enforceable against not only the parties to the arbitration agreement, but also their heirs, personal representatives, successors, and assignees.

The alternative dispute resolution clause provides that signing the arbitration agreement "shall not be a condition of admission" to the facility. Similarly, the separate arbitration agreement states that signing the agreement is not "a precondition to the furnishing of services under the [a]dmission [a]greement." A resident may terminate the arbitration agreement within ten days after signing it. Even if a resident exercises the right to terminate the arbitration agreement, the other terms of the admission agreement "remain in full force and effect."

B.

Williams died on April 27, 2020, only two months after he was admitted to Azalea Court. Williams's surviving son, James Williams, as next of kin and on behalf of his father's wrongful-death beneficiaries, sued two businesses that managed or operated Azalea Court—Smyrna Residential, LLC, and Americare Systems, Inc., both doing business as Azalea Court. His complaint asserted claims for negligence as well as "gross negligence, willful, wanton, reckless, malicious and/or intentional misconduct."

Defendants moved to compel arbitration. They argued that the 2007 power of attorney vested Sams with "broad and encompassing" authority, including the authority to enter into the arbitration agreement, and that the express terms of the agreement require arbitration of the wrongful-death action.

Plaintiff disagreed. He argued that the power of attorney did not give Sams authority to enter the arbitration agreement on Williams's behalf because it did not specify that Sams had authority to make health care decisions for Williams. In plaintiff's view, signing the arbitration agreement constituted a "health care decision" within the meaning of Tennessee Code Annotated section 34-6-203 (2001) and therefore required a specific grant of authority. Alternatively, plaintiff argued that even if Sams had authority to sign the arbitration agreement, the agreement could not bind plaintiff because he was not a party to it.

- 3 -

The trial court declined to compel arbitration. The court agreed with plaintiff that Sams lacked authority to sign the arbitration agreement. The court reasoned that entering the agreement constituted a "health care decision" and the power of attorney did not grant Sams authority to make health care decisions. And it further concluded that plaintiff would not be bound by the arbitration agreement in any event because he was not a party to it.

The Court of Appeals affirmed. *See Williams v. Smyrna Residential, LLC*, No. M2021-00927-COA-R3-CV, 2022 WL 1052429, at \*1 (Tenn. Ct. App. Apr. 8, 2022), *perm. app. granted*, (Tenn. Sept. 29, 2022). Its analysis relied heavily on this Court's decision in *Owens v. National Health Corp.*, 263 S.W.3d 876 (Tenn. 2007), *abrogated on other grounds by Welch v. Oaktree Health & Rehab. Ctr. LLC*, 674 S.W.3d 881 (Tenn. 2023). The Court of Appeals held that, under *Owens*, the decision to sign the optional arbitration agreement was "part and parcel of a healthcare decision." *Williams*, 2022 WL 1052429, at \*6. The court acknowledged that "signing a stand-alone arbitration agreement is a legal decision," but it reasoned that the arbitration agreement here was a health care decision because it "was executed in the context of [Williams's] admission to Azalea Court . . . [and] was intertwined with the decision to admit [Williams]." *Id*. Because the power of attorney executed by Williams "did not provide or even contemplate healthcare decision-making power," it did not give Sams authority to enter the arbitration agreement. *Id*. Relying on *Beard v. Branson*, 528 S.W.3d 487 (Tenn. 2017), the Court of Appeals further held that neither plaintiff nor other statutory wrongful-death beneficiaries would be bound by the arbitration agreement in any event. *Williams*, 2022 WL 1052429, at \*9. They were not signatories to the agreement, and plaintiff was "not merely a representative of [Williams] or his estate" but rather was "bringing his own right of action for his own benefit and the benefit of the other statutory beneficiaries for wrongful death." *Id.*

We granted defendants' application for permission to appeal. That application raised five issues, but we reach only two. First, we consider whether Sams had authority to enter the arbitration agreement on Williams's behalf. We conclude that she did. Second, we consider whether plaintiff and Williams's other wrongful-death beneficiaries are bound by that agreement even though they were not parties to it. We conclude that they are.[1]

---

[1] Because we hold that Sams had authority to enter the arbitration agreement under the durable power of attorney, we need not reach defendants' alternative arguments that Sams satisfied the statutory requirements to act as Williams's health care surrogate or that the Court of Appeals erred in determining that defendants had waived that argument. And because we hold that the arbitration agreement is enforceable, we need not consider defendants' argument that the failure to enforce the agreement would violate the Federal Arbitration Act.

- 4 -

II.

We review the denial of a motion to compel arbitration de novo, with no presumption of correctness. *Owens*, 263 S.W.3d at 882; *see also* Tenn. R. App. P. 13(d). Both the Federal Arbitration Act and corresponding Tennessee statutes make clear that "agreements to arbitrate disputes should be treated in the same manner as other contracts." *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 266 (Tenn. 2017). So we apply ordinary principles of contract law to determine whether there is an enforceable agreement to arbitrate. *See Taylor v. Butler*, 142 S.W.3d 277, 284 (Tenn. 2004); *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999).

We also review questions of statutory interpretation de novo. *See Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 59 (Tenn. 2023). We generally interpret statutory terms according to their "natural and ordinary meaning." *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022) (quoting *Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015)). That is, we ask "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *Id.* at 924 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)). When the statute itself defines a term, however, we must follow that definition even if it differs from the term's ordinary meaning. *See Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020); *see also Burgess v. United States*, 553 U.S. 124, 129–30 (2008) ("Statutory definitions control the meaning of statutory words . . . in the usual case." (quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949))); 2A Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:7 (7th ed.), Westlaw (database updated Nov. 2023).

Because the interpretation of a power of attorney is a question of law, our review of that issue likewise is de novo. *See Tenn. Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743, 750 (Tenn. 2007). In general, "[t]he language of a power of attorney determines the extent of the authority conveyed." *Id.* at 749 (quoting *Armstrong v. Roberts*, 211 S.W.3d 867, 869 (Tex. Ct. App. 2006)). We interpret a power of attorney "according to [its] plain terms" and "us[e] the same rules of construction generally applicable to contracts and other written instruments." *Id.* at 749–50. A power of attorney should be given "neither a 'strict' nor a 'liberal' interpretation . . . but rather a fair construction that carries out the author's intent as expressed in the instrument." *Id.* at 750. We also must consider any relevant governing statutes and interpret the power of attorney consistently with those laws. *See Owens*, 263 S.W.3d at 884.

III.

The parties do not dispute that plaintiff's claims are related to Williams's stay at Azalea Court and therefore fall within the scope of the arbitration agreement. Their

disagreement instead centers on whether the arbitration agreement was validly entered in the first place and, if so, whether it is enforceable against plaintiff, a non-signatory. We address each issue in turn.

A.

Our analysis of the first issue proceeds in three parts. We begin by introducing the statutory framework that governs powers of attorney in Tennessee. We then consider whether entering the arbitration agreement is a "health care decision" within the meaning of the Durable Power of Attorney for Health Care Act. Finally, we determine whether the durable power of attorney that Williams executed gave Sams authority to enter the agreement.

1.

The Uniform Durable Power of Attorney Act—or Uniform Act, for short—establishes a legal framework to govern durable powers of attorney. *See* Uniform Durable Power of Attorney Act, ch. 299, §§ 1–13, 1983 Tenn. Pub. Acts 509–11 (codified as amended at Tenn. Code Ann. §§ 34-6-101 to -112 (1984)). The Act enumerates twenty-two non-exclusive categories of authority that a principal may grant to an attorney-in-fact simply by incorporating that statutory provision by reference. *See* Tenn. Code Ann. § 34-6-109 (2001).[2] The Act further provides, however, that these enumerated categories should not be construed "to vest an attorney in fact with, or authorize an attorney in fact to exercise" certain specified powers. *Id.* § 34-6-108(c) (2001). Those specified powers include the authority to "[m]ake any decisions regarding medical treatments or health care, except as incidental to decisions regarding property and finances." *Id*. § 34-6-108(c)(9). A principal is always free, however, to grant an attorney-in-fact that power, as well as other powers that are not enumerated in section -109 or that are excluded under section -108. *See id.* § 34-6-108(b)(1). Similarly, a principal may "[d]elete any of the powers otherwise granted in [section -109]." *Id*. § 34-6-108(b)(2).

The power of attorney executed by Williams did not reference section -109 or expressly adopt the categories enumerated in that provision. Consequently, the limiting language of section -108 does not apply in this case. *See id.* § 34-6-108(a) ("Upon the principal clearly expressing an intention to do so within the instrument creating a power of attorney, the language contained in § 34-6-109 may be incorporated into such power of attorney by appropriate reference."); *Tenn. Farmers*, 239 S.W.3d at 749 (explaining that when the power of attorney does "not mention any provisions of the [Uniform] Act" or

---

[2] This provision of the Uniform Act has since been amended, but the 2001 version governs here because it was in effect when Williams executed the power of attorney.

"otherwise clearly express an intention to adopt the language contained in section 34-6-109," resolution of the case "does not involve the application of sections 34-6-108 and 34-6-109"). The scope of Sams's authority under the power of attorney instead is controlled by the language of the power of attorney itself, subject to any other applicable laws. *See Tenn. Farmers*, 239 S.W.3d at 749.

The Durable Power of Attorney for Health Care Act—or Health Care Act, for short—establishes requirements for durable powers of attorney for health care. *See* Durable Power of Attorney for Health Care Act, ch. 831, §§ 1–14, 1990 Tenn. Pub. Acts 355–61 (codified as amended at Tenn. Code Ann. §§ 34-6-201 to -215 (1991)). A "durable power of attorney for health care" is defined as a "durable power of attorney to the extent that it authorizes an attorney in fact to make health care decisions for the principal." Tenn. Code Ann. § 34-6-201(1) (2001). Any "durable power of attorney for health care executed after July 1, 1991," must comply with certain statutory requirements to be effective. *Id.* § 34-6-202(a).

Of particular significance here is the requirement that a health care power of attorney must "specifically authorize[] the attorney in . . . fact to make health care decisions." *Id.* § 34-6-203(a)(1). The Health Care Act defines the terms "health care" and "health care decision." *See id.* § 34-6-201(2)–(3). "Health care" means "any care, treatment, service or procedure to maintain, diagnose or treat an individual's physical or mental condition, and includes medical care as defined in § 32-11-103(5)." *Id.* § 34-6-201(2). "Health care decision" means "consent, refusal of consent or withdrawal of consent to health care." *Id.* § 34-6-201(3).[3]

2.

Plaintiff argues that entering the arbitration agreement constituted a "health care decision" within the meaning of the Health Care Act because it was part of the process of admitting Williams to an assisted-living facility. In plaintiff's view, Sams lacked authority to enter the arbitration agreement because the durable power of attorney that Williams executed did not grant her specific authority to make health care decisions.

Defendants disagree. First, they contend that entering an arbitration agreement is a legal decision and urge the Court to reject a reading of the Health Care Act that would strip an attorney-in-fact of her authority to make those decisions simply because they occurred in the health care context. Second, they contend that the arbitration agreement in this case

---

[3] A third statute enacted in 2004, the Tennessee Health Care Decisions Act, provides that durable powers of attorney for health care that comply with that law may be treated as advance directives. *See* Tenn. Code Ann. § 68-11-1803(j) (2006).

is not a "health care decision" within the meaning of the Health Care Act because it was not a condition of admission.

Because both parties rely on *Owens* to support their respective positions, we start by discussing that decision.

a.

In *Owens*, as here, this Court considered whether an attorney-in-fact had authority to enter an arbitration agreement in the course of admitting a principal to a nursing home. 263 S.W.3d at 879. Unlike here, however, the arbitration agreement in that case was a condition of admission to the facility, and the durable power of attorney granted the attorney-in-fact authority to make health care decisions but did not confer other authority. *See id.* at 879–81, 887, 890. We concluded that "an attorney-in-fact acting pursuant to a durable power of attorney for health care may sign a nursing-home contract that contains an arbitration provision because this action is necessary to 'consent . . . to health care.'" *Id.* at 884 (quoting Tenn. Code Ann. § 34-6-201(3)). We acknowledged that signing an arbitration agreement is a "legal decision" but rejected as "untenable" an approach that would allow "the attorney-in-fact [to] make one 'legal decision,' contracting for health care services for the principal, but not another, agreeing in the contract to binding arbitration." *Id.* at 884–85. "Holding that an attorney-in-fact can make some 'legal decisions' but not others," we explained, "would introduce an element of uncertainty into health care contracts signed by attorneys-in-fact" that could make it harder to obtain health care. *Id.* at 885.

Both sides cite *Owens* to support their positions. Plaintiff points to *Owens* in arguing that all decisions made in the course of admitting someone to a health care facility constitute "health care decisions" that require a specific grant of authority. Defendants, meanwhile, cite *Owens* to bolster their view that entering an arbitration agreement is a "legal decision" that Sams had authority to make under the power of attorney Williams executed.

*Owens*, however, does not dictate the outcome in this case. The issue in *Owens*, although superficially similar to the question here, differed in material respects. The attorney-in-fact in *Owens* only had authority to make health care decisions. *Id.* at 879. And the arbitration agreement there was a condition of admission to the facility. *Id.* at 879–81, 887, 890. To resolve this case, we must look beyond *Owens* and consider as a matter of first impression whether an attorney-in-fact with general authority to act for a principal in "all claims and litigation matters," but no specific authority to make health care decisions, may enter an arbitration agreement in the course of admitting a principal to a health care facility when that agreement is not a condition of admission.

- 8 -

To determine whether signing the arbitration agreement here was a "health care decision" within the meaning of the Health Care Act, we examine the statutory language. The Health Care Act defines the terms "health care" and "health care decision" for purposes of the statute, so those statutory definitions control. "Health care" means "any care, treatment, service or procedure to maintain, diagnose or treat an individual's physical or mental condition, and includes medical care as defined in § 32-11-103(5)." Tenn. Code Ann. § 34-6-201(2).[4] "Health care decision" means "consent, refusal of consent or withdrawal of consent to health care." *Id*. § 34-6-201(3). The term "consent" is not defined by the statute. But dictionaries define the term to mean "[a]greement; approval; permission" or a "voluntary agreement by a person in the possession and exercise of sufficient mental capacity to make an intelligent choice to do something proposed by another." *Consent*, Black's Law Dictionary 305 (6th ed. 1990); *see also Consent*, The Oxford English Dictionary 760 (2d ed. 1989) ("Voluntary agreement to or acquiescence in what another proposes or desires; compliance, concurrence, permission.").

Sams did not make a "health care decision" when she signed the arbitration agreement as part of the process of admitting Williams to Azalea Court. An arbitration agreement is an agreement to submit certain legal disputes to arbitration. The only thing Sams "consent[ed] to" when she entered the arbitration agreement in this case was to have Williams's claims adjudicated in a particular forum. The arbitration agreement was not a condition of admission to the facility or otherwise required for Williams to obtain health care. In these circumstances, unlike in *Owens*, signing the arbitration agreement was not "necessary to 'consent . . . to health care.'" *Owens*, 263 S.W.3d at 884 (quoting Tenn. Code Ann. § 34-6-201(3)).

The Court of Appeals acknowledged that "signing a stand-alone arbitration agreement is a legal decision" and that the arbitration agreement here was optional. *Williams*, 2022 WL 1052429, at *6. It nevertheless deemed the arbitration agreement in this case a "health care decision" because "it was bound up in the context of a healthcare decision" and "part and parcel of" that decision. *Id.*

---

[4] Tennessee Code Annotated 32-11-103(5) defines "[m]edical care" to include "any procedure or treatment rendered by a physician or health care provider designed to diagnose, assess or treat a disease, illness or injury." Such procedures and treatments include "surgery; drugs; transfusions; mechanical ventilation; dialysis; cardiopulmonary resuscitation; artificial or forced feeding of nourishment, hydration or other basic nutrients, regardless of the method used; radiation therapy; or any other medical act designed for diagnosis, assessment or treatment or to sustain, restore or supplant vital body function." Tenn. Code Ann. § 32-11-103(5) (2001).

That reasoning cannot be reconciled with the language of the Health Care Act. The Act defines the term "health care decision" to mean "consent, refusal of consent or withdrawal of consent to health care." Tenn. Code Ann. § 34-6-201(3). The statutory definition focuses narrowly on the *consent to* health care or the refusal or withdrawal thereof; it does not sweep in any and all decisions related to or occurring in the context of health care. An optional agreement to arbitrate in no way confers or withdraws consent to receive "any care, treatment, [or] service . . . to maintain, diagnose or treat an individual's physical or mental condition." *Id*. § 34-6-201(2). Consequently, it does not constitute a "health care decision."

Plaintiff contends that, in *Owens*, we "rejected the notion that some decisions made in the process of admitting a person to a long-term care facility can be carved out as legal decisions while the rest remain healthcare decisions." But our holding in *Owens* rested largely on the statutory definitions of "health care" and "health care decision." The arbitration agreement there constituted "consent . . . to health care" because it was required for admission to the facility. 263 S.W.3d at 884 (quoting Tenn. Code Ann. § 34-6-201(3)). We had no occasion in *Owens* to consider the distinct question presented in this case: whether an arbitration agreement that is *not* a condition of admission is a "health care decision." We now hold that it is not.

Other state appellate courts with similar statutory definitions have reached the same conclusion. *See, e.g.*, *State ex rel. AMFM, LLC v. King*, 740 S.E.2d 66, 75 (W. Va. 2013) ("[A]n agreement to submit future disputes to arbitration, which is optional and not required for the receipt of nursing home services, is not a health care decision under the West Virginia Health Care Decisions Act." (citing W. Va. Code Ann. § 16-30-1 *et seq.* (LexisNexis 2006))); *Gayle v. Regeis Care Ctr., LLC*, 191 A.D.3d 598, 599–600 (N.Y. App. Div. 2021) (holding that health care surrogate did not have authority to execute "entirely optional" arbitration agreement that "had no bearing" on receipt of health care (citing N.Y. Pub. Health Law § 2994-a(12), (14) (McKinney 2015))); *Primmer v. Healthcare Indus.*, 43 N.E.3d 788, 792–93 (Ohio Ct. App. 2015) (explaining that decision to "submit disputes between nursing homes and their patients to binding arbitration" is not a "health care decision" where "execution of the arbitration agreement was not necessary for admission" (citing Ohio Rev. Code Ann. § 1337.11(G)–(H) (LexisNexis 2006))); *GGNSC Stanford, LLC v. Rowe*, 388 S.W.3d 117, 124 (Ky. Ct. App. 2012) (holding that "separate and ancillary" arbitration agreement did "not concern any type of medical treatment, procedure, or intervention" and "was not a necessary part" of the facility admission agreement (citing Ky. Rev. Stat. Ann. § 311.621(8) (LexisNexis 1995))).

And still other courts have held the same by interpreting language in the power of attorney itself that granted authority to make health care decisions. *See, e.g.*, *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 592–94 (Ky. 2012) (holding that a power of attorney

- 10 -

granting the agent authority to make health care decisions, among other broad powers, did not confer authority to enter optional arbitration agreement); *Life Care Ctrs. of Am. v. Smith*, 681 S.E.2d 182, 185 (Ga. Ct. App. 2009) (similar); *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. Ct. App. 2007) (similar); *cf. Primmer*, 43 N.E.3d at 793 (holding that "plain language of the power attorney" further supported the conclusion that the arbitration agreement was not a "health care decision").

The Court of Appeals cited two unpublished decisions from the United States District Court for the Western District of Tennessee as support for its contrary holding. *Williams*, 2022 WL 1052429, at *4–6 (citing *Crawford v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. 2:21-cv-02054-TLP-tmp, 2021 WL 3926244, at *7–10 (W.D. Tenn. Sept. 1, 2021), and *Sykes v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:19-cv-02602-SHL-tmp, 2020 WL 7866881, at *3 (W.D. Tenn. Sept. 1, 2020)). But *Crawford* and *Sykes* are distinguishable. In each case, the broader agreement containing the arbitration clause expressly stated that "the signing of th[e] [a]greement, both by itself and in conjunction with the corresponding admission and receipt of services, is a health care decision." *Crawford*, 2021 WL 3926244, at *6; *see Sykes*, 2020 WL 7866881, at *3. And in each case, the court focused on the "plain language" of the arbitration agreement itself in concluding that the agreement was a health care decision. *Crawford*, 2021 WL 3926244, at *6; *Sykes*, 2020 WL 7866881, at *3. *Sykes* does not even mention, let alone carefully interpret and apply, the statutory definition of "health care decision." Although *Crawford* cites that definition, it does not explain why the arbitration agreement in that case fits within it. *See* 2021 WL 3926244, at *4. Finally, neither *Crawford* nor *Sykes* indicated whether the arbitration agreements at issue in those cases were conditions of admission. We do not find these non-binding precedents persuasive.

Because we conclude that signing an optional arbitration agreement during admission to a health care facility is not a "health care decision" within the meaning of the Health Care Act, we need not reach defendants' broader argument that the Health Care Act does not preclude an attorney-in-fact with general authority to make legal decisions from exercising that authority in the health care context, even if the decision falls within the statutory definition of "health care decision."

c.

The dissenting opinions raise a few points that warrant response.

*First*, the dissenting opinions argue that it is unclear whether the arbitration agreement in *Owens* was actually mandatory. But both the opinion in *Owens* and the parties' filings in that case confirm that the agreement was a condition of admission to the facility.

Start with the opinion. One of the issues we addressed in *Owens* was the plaintiff's contention "that it is illegal to require a patient to sign an arbitration agreement waiving the right to a jury trial as a precondition for being admitted to a nursing home." 263 S.W.3d at 887. That argument was premised on a federal statute and regulation that prohibit a "nursing facility" from receiving "any gift, money, donation, or other consideration as a precondition" to admitting a Medicare or Medicaid recipient to the facility. *Id.* (emphasis omitted) (quoting 42 U.S.C. § 1396r(c)(5)(A)(iii) (Supp. 2007) and 42 C.F.R. § 483.12(d)(3) (2006)). In rejecting the plaintiff's argument, this Court did not question whether the arbitration agreement was mandatory. It instead concluded that the agreement did not violate federal law because "requiring a nursing-home admittee to agree to arbitrate a dispute with the nursing home is not equivalent to charging an additional fee or other consideration." *Id.* Had the arbitration agreement not been mandatory—or had there been some uncertainty in that regard—we surely would have mentioned it instead of addressing the plaintiff's argument on the merits.

Next consider the parties' filings. In opening and reply briefs filed in this Court, the plaintiff in *Owens* stated that the arbitration clause was "a condition of admission" that could not "be revoked independent of revocation of the entire admission agreement." Brief of Plaintiff-Appellant at xiv, *Owens*, 263 S.W.3d 876 (No. M2005-01272-SC-R11-CV); Reply Brief of Plaintiff-Appellant at xii, *Owens*, 263 S.W.3d 876 (No. M2005-01272-SC-R11-CV). The defendants' brief did not dispute this assertion, either in its statement of facts or its response to the plaintiff's argument that the agreement constituted "'other consideration' as [a] precondition of admission to the nursing home." *See* Brief of Defendants-Appellees at 23–24, *Owens*, 263 S.W.3d 876 (No. M2005-01272-SC-R11-CV).

After losing in this Court, the plaintiff in *Owens* filed a petition for certiorari in the United States Supreme Court. The question presented stated in relevant part:

> The defendants below, Respondents here, are the owners and operators of a nursing home *that requires the execution of a pre-dispute arbitration clause* waiving all rights to access to the courts and a jury trial as a condition of admission to their facility. . . . [T]he question presented in this petition is [whether] a nursing home [may] require a Medicare recipient to waive substantive rights by entering into a binding and mandatory pre-dispute arbitration clause as a *condition of admission*.

Petition for Writ of Certiorari at i, *Owens v. Nat'l Health Corp.*, 129 S. Ct. 59 (2008) (No. 07-1380), 2008 WL 1969300, at *i (emphasis added). The petition also included the following statement: "It is undisputed that agreeing to [the arbitration] provision is a *condition of admission* to the nursing home. It cannot be revoked independent of revocation

of the entire admission agreement." *Id.* at 7, 2008 WL 1969300, at \*7 (emphasis added). The brief in opposition filed by the defendants in *Owens* did not dispute that the arbitration provision was a condition of admission. *See* Brief in Opposition, *Owens*, 129 S. Ct. 59, 2008 WL 2355787. Again, had there been any disagreement on that front, the defendants surely would have mentioned it.

*Second*, Justice Lee's dissenting opinion contends that, even if the arbitration agreement in *Owens* was mandatory, that is not a valid ground for distinguishing *Owens*. In her view, any decision that is "required to be made upon admission" to a health care facility is a health care decision, even if the decision is "not required to be made in a certain way." This reasoning suffers from the same problem as the Court of Appeals' analysis in the decision below: it cannot be squared with the text of the Health Care Act. A "health care decision" is defined narrowly as "consent, refusal of consent or withdrawal of consent to health care." Tenn. Code Ann. § 34-6-201(3). An ancillary agreement that is not a precondition to admission to a health care facility cannot plausibly be understood as "consent . . . to health care" because it is not a necessary part of granting permission for treatment. *Id*.

Justice Lee also argues that the "arbitration agreement was part of the admission agreement—not a separate agreement" because the larger admission agreement expressly references the arbitration provision and contains an integration clause. This argument is largely beside the point. The plain language of the contract made clear that signing the agreement was not "a condition of admission" or a "precondition to the furnishing of services." Even if the signed arbitration agreement is properly understood as part of the larger admission agreement, that does not change the arbitration agreement's optional nature.

*Third*, the dissenting opinions claim that our opinion leaves many questions unanswered and creates uncertainty in this area of the law. To the extent we are leaving questions unanswered, that is because we may only decide the questions that are presented by this case. *See, e.g.*, *State v. Bristol*, 654 S.W.3d 917, 924–25 (Tenn. 2022); *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976). "We have neither constitutional authority nor inherent power to give advisory opinions" on other issues that are not before us. *Dorrier*, 537 S.W.2d at 890.

Chief Justice Kirby's dissenting opinion asserts that it "would be much more practical for the Court to just overrule" *Owens* rather than distinguish it. But no party has asked us to overrule *Owens*, let alone briefed the issue of whether *Owens* should be overruled. In fact, when asked at oral argument whether the Court should overrule *Owens*, counsel for defendants insisted that *Owens* is distinguishable and need not be overruled to resolve this appeal. Deciding whether to overrule a precedent entails consideration of

- 13 -

several factors, not simply whether that outcome would be "more practical." *See Frazier v. State*, 495 S.W.3d 246, 253 (Tenn. 2016). Accordingly, that question is best addressed in a case where it is raised by the parties and developed through adversarial presentation. *Cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 n.5 (2020) ("Before overruling precedent, the Court usually requires that a party ask for overruling, or at least obtains briefing on the overruling question, and then the Court carefully evaluates the traditional *stare decisis* factors.").

As for uncertainty, the distinction we draw between mandatory and optional arbitration agreements follows from the plain language of the Health Care Act. If that distinction proves problematic, the legislature may amend the statute. In the meantime, nothing prevents an individual from executing *both* a health care power of attorney and a general durable power of attorney to ensure that an attorney-in-fact has authority to make all decisions that may arise in the course of seeking and obtaining health care.

3.

We next consider whether Williams's durable power of attorney granted Sams the authority to enter the arbitration agreement. To answer that question, we look to the "plain terms" of the power of attorney and give those terms a "fair construction." *Tenn. Farmers*, 239 S.W.3d at 750.

Recall that the power of attorney granted Sams ten powers. One of those powers was to act on Williams's behalf "in all claims and litigation matters," without restriction.

The noun "claim" means "[t]he aggregate of operative facts giving rise to a right enforceable by a court," or "[t]he assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional." *Claim*, Black's Law Dictionary 281–82 (9th ed. 2009). "Litigation" means "[t]he process of carrying on a lawsuit." *Litigation*, Black's Law Dictionary 1017 (9th ed. 2009). The word "litigation" modifies the noun "matter," which means "[a] subject under consideration, esp. involving a dispute or litigation." *Matter*, Black's Law Dictionary 1067 (9th ed. 2009).

The power to act on Williams's behalf "in all claims and litigation matters" encompasses the authority to sign an arbitration agreement. By signing the arbitration agreement, Sams agreed that Williams's "legal claim[s]" arising from his stay at Azalea Court would be "determined by submission to arbitration . . . and not by a lawsuit or resort to court process" and further agreed that Williams would "giv[e] up [his] constitutional right to have any such dispute decided in a court of law before a jury." In other words, Sams decided *where* Williams's claims would be resolved. The power of attorney confers authority to act on Williams's behalf "in all claims," without restriction to claims pending

in a judicial forum and without directing that claims must be resolved in a particular way. The power to act on Williams's behalf with respect to "all claims" thus includes the authority to decide the means of resolving those claims. *See* Stephen J. Ware, *Principles of Alternative Dispute Resolution* § 1, at 3 (3d ed. 2016) (explaining that claims only sometimes lead to litigation and that "[t]he possible means of disputing [a claim] are limited only by disputants' imaginations").

We are not the only court to hold that a "claims and litigation" clause in a power of attorney confers authority to sign an arbitration agreement. The Florida District Court of Appeal similarly has held that "the power to act with respect to 'claims and litigation' is commonly understood to include the power to submit to arbitration." *Candansk, LLC v. Est. of Hicks ex rel. Brownridge*, 25 So. 3d 580, 584 (Fla. Dist. Ct. App. 2009); *see also Zephyr Haven Health & Rehab Ctr., Inc. v. Est. of Clukey ex rel. Clukey*, 133 So. 3d 1230, 1232 (Fla. Dist. Ct. App. 2014). As *Candask* noted, moreover, statutes in many other States specify that "claims and litigation" language in a power of attorney "empowers the attorney-in-fact to submit to arbitration or 'alternative dispute resolution.'" 25 So. 3d at 583. And so too does a more recent version of the Uniform Power of Attorney Act proposed by the Uniform Law Commission. Unif. Power of Att'y Act § 212, 8B U.L.A. 241–42 (2014) (providing that "language in a power of attorney granting general authority with respect to claims and litigation authorizes the agent to . . . submit to alternative dispute resolution"). Tennessee does not have a similar statutory provision, but these laws further support our conclusion that a provision conferring authority to act for a principal in "all claims and litigation matters" is most reasonably understood to include the power to enter an arbitration agreement.

* * *

In sum, we hold that (1) signing an arbitration agreement that is not a condition of admission to a health care facility is not a "health care decision" under the Health Care Act, and (2) Sams had authority to sign the arbitration agreement because the durable power of attorney gave her the power to act for Williams "in all claims and litigation matters."

## B.

We now turn to our final question: whether plaintiff, as a wrongful-death beneficiary, is bound by the arbitration agreement even though he was not a party to it.

We apply "ordinary contract principles" to determine who is bound by an arbitration agreement. *Harvey*, 532 S.W.3d at 265. Although an arbitration requirement generally may be invoked only by and against a signatory to that agreement, a non-signatory who would

be bound by an agreement under traditional principles of contract or agency law or other generally applicable legal principles likewise will be bound by an arbitration agreement. *See id.* (noting that the "way in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law" (alteration omitted) (quoting *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960))); *see also Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 618–20 (Tenn. 2004) (applying general principles of contract law to conclude that an "arbitration provision in a contract is enforceable against a third-party beneficiary who has filed a cause of action seeking to enforce the contract"); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) (explaining that "a non-signatory cannot be bound to arbitrate unless it is bound 'under traditional principles of contract and agency law' to be akin to a signatory of the underlying agreement" (quoting *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999))).

One circumstance in which other courts have held a non-signatory to be bound by a contract is when the non-signatory is in privity with the signatory. *See, e.g.*, *Isp.com LLC v. Theising*, 805 N.E.2d 767, 774 (Ind. 2004) ("An arbitration clause, like any other contract, binds the parties to the agreement and those in privity."); *see also* 6 C.J.S. *Arbitration* § 15, Westlaw (database updated Aug. 2023) (explaining that "[g]eneral contract rules apply as to . . . who is bound by[] an agreement to arbitrate" and "[t]hus, a person must be a party to or in privity with a party to an arbitration agreement in order to . . . be bound by it" (footnote omitted)). We have defined privity as a "mutual . . . relationship to the same rights of property." *Fultz v. Fultz*, 175 S.W.2d 315, 316 (Tenn. 1943) (alteration in original) (quoting 24 *American and English Encyclopaedia of Law* 746 (David S. Garland et al. eds., 2d ed. 1903)); *see also Phillips v. Gen. Motors Corp.*, 669 S.W.2d 665, 669 (Tenn. Ct. App. 1984) (noting that "[p]rivity in the traditional sense mean[s] mutual or successive relationship to the same rights of property"); *Pers. Loan & Fin. Co. v. Kinnin*, 408 S.W.2d 662, 664 (Tenn. Ct. App. 1966) (citing Black's Law Dictionary for the same definition).

Defendants argue that the claims of plaintiff and Williams's other wrongful-death beneficiaries must be arbitrated because those claims are "derivative" of any claim that Williams would have had. They contend that wrongful-death beneficiaries "stand[] in the shoes" of the decedent to assert the claims that belonged to the decedent. In support of that argument, defendants point to the statutes creating the wrongful-death cause of action in Tennessee and our precedents discussing that cause of action. We thus recap the history of wrongful-death actions in Tennessee before addressing defendants' argument.

- 16 -

1.

A claim for wrongful death did not exist at common law. *Beard*, 528 S.W.3d at 496. That was because "in a civil court the death of a human being could not be complained of as an injury." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 596 (Tenn. 1999) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 127, at 945 (5th ed. 1984)). "This rule of non-liability for wrongful death was previously the prevailing view in both England and in the United States." *Id.*

In 1846, to address the "harsh effect of denying recovery for personal injuries resulting in death," the British Parliament enacted "Lord Campbell's Act." *Id.* This legislation "created a cause of action for designated survivors that accrued upon the tort victim's death." *Id.*

Only four years later, in 1850, Tennessee's General Assembly enacted legislation allowing personal representatives to pursue legal action on behalf of widows or next of kin in cases of wrongful death. *Id.* The new legislation permitted a legal action even if no proceedings had been commenced before the victim's death. *Id.*

Tennessee was not an outlier. All States eventually abrogated the common-law rule by enacting what generally have been characterized as either "survival statutes" or "purely wrongful death statutes." *Beard*, 528 S.W.3d at 496 (quoting *Jordan*, 984 S.W.2d at 597). Survival statutes "permit the victim's cause of action to survive the death, so that the victim, *through the victim's estate*, recovers damages that would have been recovered by the victim had the victim survived." *Id.* at 496 (quoting *Jordan*, 984 S.W.2d at 597). These statutes "do not create a new cause of action" but transfer the cause of action from the victim at the time of death "to the person designated in the statutory scheme to pursue it." *Id.* at 496–97 (quoting *Jordan*, 984 S.W.2d at 597). Recoverable damages are limited to those "to which the decedent would have been entitled, such as lost wages, medical expenses, [and] pain and suffering." *Id.* at 497.

Wrongful-death statutes, by contrast, "create a new cause of action in favor of the survivors of the victim for their loss occasioned by the death." *Id.* (quoting *Jordan*, 984 S.W.2d at 597). These survivors are entitled to not only the damages the decedent would have recovered, but also the "loss of the economic benefit which they might reasonably have expected to receive from the decedent in the form of support, services or contributions during the remainder of [the decedent's] lifetime if [the decedent] had not been killed." *Id.* (alteration in original) (quoting *Jordan*, 984 S.W.2d at 598).

We have described Tennessee's current wrongful-death statutory scheme as a "hybrid" scheme with a "split personality." *Id.* (quoting *Jordan*, 984 S.W.2d at 598). On

- 17 -

the one hand, the scheme resembles a survival statute because it provides that the cause of action a decedent "would have had against the wrongdoer . . . shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse[,] . . . children or next of kin[,] or . . . personal representative, for the benefit of the person's surviving spouse or next of kin." Tenn. Code Ann. § 20-5-106(a) (1994 & Supp. 2006).[5] On the other hand, it also resembles a pure wrongful-death statute because any funds recovered from a wrongful-death action are "free from the claims of creditors," *id.*, and statutory beneficiaries may recover *both* the damages suffered by the decedent and the damages suffered by the beneficiaries, *id.* § 20-5-113 (1994).

Notwithstanding its hybrid nature, we have referred to our statutory scheme "as 'survivor legislation' because [it] preserve[s] whatever cause of action the decedent had at the time of death." *Beard*, 528 S.W.3d at 499. Our statutes "do not create a new cause of action in the beneficiaries," but instead "provide for the continued existence and passing of the right of action of the deceased." *Id.* (internal quotation mark omitted) (quoting *Jordan*, 984 S.W.2d at 598).

2.

Defendants contend that the "plain language" of our wrongful-death statute and this Court's precedents require that plaintiff's claims be submitted to arbitration. We agree.

As explained above, our wrongful-death statute provides that the decedent's cause of action "pass[es] to the person's surviving spouse" and other beneficiaries. Tenn. Code Ann. § 20-5-106(a). The term "pass," when used as a verb, as it is here, means "[t]o transfer from one owner to another; to sell or assign." *Pass*, Noah Webster, *An American Dictionary of the English Language* 592 (3d ed. 1830); *see also Pass*, Robert Gordon Latham, *A Dictionary of the English Language* 980 (1876) ("Transfer to another proprietor, or into the hands of another.").

When Williams died, his wrongful-death action "passed"—i.e., was transferred—to his beneficiaries. The claims of his beneficiaries therefore are derivative of Williams's claims and are subject to the same limitations as those claims. Tellingly, plaintiff concedes that, "[i]f the decedent were to release all claims related to the injury-producing incident while he were still alive, such a release would necessarily extinguish all other potential causes of action arising from that same incident, including a wrongful death action," because there would be "no claim to *survive* the decedent's death." Plaintiff attempts to

---

[5] The statutory scheme gives the surviving spouse priority to bring the cause of action and control the litigation. If there is no surviving spouse, then priority goes to the children, and then to the next of kin. *Beard*, 528 S.W.3d at 499–500.

- 18 -

distinguish an arbitration agreement from a release by reasoning that "an arbitration agreement does not extinguish any claims." But it would be an "anomalous result" to bind wrongful-death beneficiaries to a contract that extinguishes their claims altogether and not to one that merely changes the forum for resolving them. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009).

This conclusion fits with this Court's precedents, which uniformly treat a wrongful-death claim as derivative of the claim belonging to the decedent. *See, e.g.*, *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 529 (Tenn. 2008) ("It is well settled that a wrongful death action is a claim belonging to the decedent, not the decedent's beneficiaries."); *Sullivan ex rel. Wrongful Death Beneficiaries of Sullivan v. Chattanooga Med. Invs., LP*, 221 S.W.3d 506, 511 (Tenn. 2007) ("[A] wrongful death action belongs to the deceased person and not to his survivors."); *Ki v. State*, 78 S.W.3d 876, 880 (Tenn. 2002) ("The decedent's survivors are only asserting the decedent's right of action on behalf of the decedent."); *Kline v. Eyrich*, 69 S.W.3d 197, 206 (Tenn. 2002) ("[T]he statutes permitting an action for the wrongful death of another create 'no right of action exist[ing] independently of that which the deceased would have had, had [he or she] survived'" (alterations in original) (quoting *Rogers v. Donelson-Hermitage Chamber of Com.*, 807 S.W.2d 242, 245 (Tenn. Ct. App. 1990))); *Lynn v. City of Jackson*, 63 S.W.3d 332, 335 (Tenn. 2001) (recognizing that Tennessee's "wrongful death statute does not create a new cause of action in the beneficiaries"); *Jordan*, 984 S.W.2d at 601 (holding that "consortium-type damages may be considered [in wrongful-death actions] when calculating the pecuniary value of a deceased's life" and making clear that "[t]his holding d[id] not create a new cause of action").

This conclusion also aligns with the decisions of courts in other States with wrongful-death claims that are derivative in nature. *See, e.g.*, *Searcy Healthcare Ctr., LLC v. Murphy*, No. CV-13-210, 2013 WL 6047164, at *3 (Ark. Nov. 14, 2013) ("[B]ecause the wrongful-death claim is derivative, the wrongful-death beneficiaries have the same limitations as the decedent would if the decedent brought the claim, and are bound by the agreements entered into by the decedent involving the decedent's claims."); *Laizure v. Avante at Leesburg, Inc.*, 109 So. 3d 752, 762 (Fla. 2013) ("[T]he nature of a wrongful death cause of action in Florida is derivative in the context of determining whether a decedent's estate and heirs are bound by the decedent's agreement to arbitrate. The estate and heirs stand in the shoes of the decedent for purposes of whether the defendant is liable and are bound by the decedent's actions and contracts with respect to defenses and releases."); *Labatt*, 279 S.W.3d at 646 (explaining that Texas's statutory wrongful-death claim is "an entirely derivative cause of action" that depends on "the decedent's right to maintain suit for his injuries"); *Cleveland v. Mann*, 942 So. 2d 108, 119 (Miss. 2006) ("Because [the decedent] agreed to arbitrate, he could not have brought this claim for medical malpractice even if death had not ensued. He would have been required to submit

his claim to arbitration. Therefore, since [the decedent] could not have brought this claim, neither can plaintiffs."); *Ballard v. Sw. Detroit Hosp.*, 327 N.W.2d 370, 371–72 (Mich. Ct. App. 1982) (explaining that Michigan's wrongful-death "cause of action is expressly made derivative of the decedent's rights" and that the personal representative therefore is "bound by the arbitration agreement to the same extent the decedent would have been bound had she survived").

Plaintiff urges us to consider instead the Illinois Supreme Court's decision in *Carter v. SSC Odin Operating Co.*, 976 N.E.2d 344 (Ill. 2012). Although that court had previously described a wrongful-death claim as "derivative," it nevertheless held that a wrongful-death plaintiff was not bound by an arbitration agreement entered by the decedent. *Id.* at 358–59, 361. The court acknowledged that a wrongful-death plaintiff could be bound by an arbitration agreement signed by the decedent "to the extent th[e] plaintiff is acting in [the decedent's] stead." *Id.* at 360. But it explained that the plaintiff in that case, who was the personal representative of the decedent and not a wrongful-death beneficiary, was "merely a nominal party, effectively filing suit as a statutory trustee on behalf of the next of kin" who are "the true parties in interest." *Id.*; *see also id.* at 354 (referencing the statutory requirement that a wrongful-death action be "brought by and in the names of the 'personal representatives' of the deceased" (quoting 740 Ill. Comp. Stat. 180/2 (2006))). Because the plaintiff was "not prosecuting the wrongful-death claim on behalf of" the decedent, he was "not bound by [the decedent's] agreement to arbitrate." *Id.* at 360.

*Carter* is of little help to plaintiff. The Illinois Supreme Court reached a different conclusion only because the wrongful-death statute at issue in that case created a "new cause of action" to be brought by the decedent's personal representative on behalf of the next of kin. *Id.* at 354. In Tennessee, by contrast, the decedent's cause of action "pass[es]" to the surviving spouse, next of kin, or personal representative, who stands in the shoes of the decedent to bring the decedent's claim. Tenn. Code Ann. § 20-5-106(a).

Other cases that have declined to bind wrongful-death plaintiffs to arbitration agreements signed by the decedent similarly involved wrongful-death statutes that created a new cause of action. *See, e.g.*, *Boler v. Sec. Health Care, L.L.C.*, 336 P.3d 468, 476–77 (Okla. 2014) (citing Article 23, section 7, of Oklahoma's constitution which "provides that the right of action to recover damages for injuries resulting in death shall never be abrogated," and Oklahoma's Wrongful Death Act, which "created a new cause of action for pecuniary losses," in holding that "a decedent cannot bind the beneficiaries to arbitrate their wrongful death claim"); *Ping*, 376 S.W.3d at 598–600 (explaining that wrongful-death claims are not derivative, but "separate and distinct," in holding that wrongful-death beneficiaries were not bound by decedent's arbitration agreement); *Lawrence v. Beverly Manor*, 273 S.W.3d 525, 529 (Mo. 2009) (en banc) (holding that wrongful-death plaintiffs were not bound by an arbitration agreement because "[a] claim for wrongful death is not

derivative from any claims [the decedent] might have had, and the damages are not awarded to the wrongful death plaintiffs on [the decedent's] behalf"); *Peters v. Columbus Steel Castings Co.*, 873 N.E.2d 1258, 1262 (Ohio 2007) (holding that, unlike survival actions brought on behalf of a decedent's estate, wrongful-death claims "accrue[] independently to [the decedent's] beneficiaries for the injuries they personally suffered as a result of the death" and, therefore, non-signatory beneficiaries "cannot be forced into arbitration"); *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 663 (Pa. Super. Ct. 2013) (holding "that Pennsylvania's wrongful death statute creates an independent action distinct from a survival claim that, although derived from the same tortious conduct, is not derivative of the rights of the decedent" and concluding that wrongful-death claimants were not subject to arbitration agreement); *Woodall v. Avalon Care Ctr.-Fed. Way, LLC*, 231 P.3d 1252, 1261 (Wash. Ct. App. 2010) (holding that heirs were not required to arbitrate wrongful-death claims and explaining that "wrongful death claims in Washington are not 'derivative'").[6]

Plaintiff also relies on our decision in *Beard* in arguing that a wrongful-death beneficiary should not be bound by a decedent's pre-death arbitration agreement. Specifically, plaintiff points to our statement in *Beard* that a surviving spouse who brings a wrongful-death claim "asserts his own right of action for his own benefit and for the benefit of the other statutory beneficiaries who share in any recovery." 528 S.W.3d at 503.

Read in context, however, that language from *Beard* does not support plaintiff's position. The issue in *Beard* was whether a surviving spouse could litigate a wrongful-death claim pro se. *Id.* at 495. We explained that the "right of self-representation extends only to the individual's right to conduct and manage his or her *own* case" and does not permit a non-attorney to "conduct litigation on behalf of an entity or another individual." *Id.* The plaintiff spouse argued that he was bringing his own case. *Id.* at 496. The defendants contended that the plaintiff was acting in a representative capacity on behalf of the decedent or other statutory beneficiaries. *Id.* We rejected the defendants' view that the spouse was acting "in a representative capacity" and concluded instead that the spouse was "assert[ing] his own right of action for his own benefit and for the benefit of the other statutory beneficiaries who share in any recovery." *Id.* at 503. We made clear, however, that spouse was not asserting a "new cause of action" but rather the very same cause of action that

---

[6] At least one state court has focused on the intent of the contracting parties in determining whether a wrongful-death plaintiff is bound by an arbitration agreement entered by a decedent. *See, e.g.*, *Allen v. Pacheco*, 71 P.3d 375, 379–80 (Colo. 2003) (en banc) (holding that a beneficiary is bound when the contract reflects the parties' intent to bind beneficiaries).

originally belonged to the decedent and later passed to the surviving spouse. *Id.* at 499. *Beard* thus further supports our conclusion.[7]

## CONCLUSION

In sum, we hold that entering an optional arbitration agreement with a health care facility is not a "health care decision" within the meaning of the Durable Power of Attorney for Health Care Act; that Sams had the authority under the "claims and litigation matters" clause of the 2007 power of attorney to sign the arbitration agreement on Williams's behalf; and that plaintiff is bound by that agreement. We therefore reverse the decision of the Court of Appeals and remand for further proceedings consistent with this opinion. Costs of this appeal are taxed to plaintiff, for which execution may issue.

_____
SARAH K. CAMPBELL, JUSTICE

---

[7] Defendants argue in the alternative that plaintiff is bound to arbitrate under the "plain language" of the arbitration agreement itself. Given our conclusion that plaintiff is bound to arbitrate under ordinary contract principles, we need not address that argument.